ROEHL, Plaintiff in error, v. STATE, Defendant in error.

*No. 75–718–CR. Argued January 6, 1977.—Decided May 3, 1977.*
(Also reported in 253 N. W. 2d 210.)

For the plaintiff in error the cause was argued by *Ruth S. Downs*, deputy state public defender, with whom on the briefs was *Howard B. Eisenberg*, state public defender.

For the defendant in error the cause was argued by *Betty R. Brown*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

HEFFERNAN, J. The plaintiff-in-error, Thomas John Roehl, on September 19, 1974, was found guilty of two counts of armed robbery, contrary to sec. 943.32(1) (b) and (2) and sec. 939.05, Stats. He and a codefend-

ant, Peter Olson, were sentenced to seven years on each count, to be served concurrently, and consecutively to sentences previously imposed.

We conclude that no prejudicial error occurred during the course of the trial, that the evidence was sufficient to sustain the convictions, and that the sentences imposed did not result from an abuse of discretion. Accordingly, we affirm the judgment of conviction and sentence and the order which denied postconviction motions.

Roehl and his codefendant, Olson, who is not a party to this appeal, were members of a motorcycle club known as the "Milwaukee Outlaws." The alleged victims of the armed robbery were members of a rival motorcycle club known as the "Heaven's Devils." The "Heaven's Devils" members who were allegedly victims of the armed robbery that took place on April 26, 1974, were Robert Potrykas, Scott Girga, Michael Vermilyea, John Otto, William Bach, Thomas Ponchik, Terry Jahnke, David Wall, and Jack Guehrer.

The armed robberies took place in the apartment of Robert Potrykas, one of the "Heaven's Devils" members.

The record indicates that the removal of the patch or insignia of a rival motorcycle club member is considered to be humiliating to the "depatched" person and to his club. It apparently is analogous to counting coup, as practiced by the American Indians of the Plains.

The armed robbery charges are based upon the taking of the patches from members of the "Heaven's Devils" by Roehl and Olson, and the taking of a small sum of money, when accompanied by threat of the imminent use of force while armed with a dangerous weapon.

The defendants were charged initially with five counts of armed robbery, and the information reciting all of these counts was read to the jury by the judge at the commencement of the trial.

Count 1 recited that a shortwave radio was taken from Robert Potrykas; Count 2 recited that a patch was taken

from Jack D. Guehrer; Count 3 recited that a patch was taken from Scott J. Girga; Count 4 recited that a patch was taken from Thomas J. Ponchik; and Count 5 recited that $3.00 was taken from Mike Vermilyea.

Because Potrykas, Guehrer, and Ponchik were never produced to testify, the counts concerning them were dismissed, and the jury returned a verdict in respect to the armed robbery from the persons of Girga and Vermilyea.

One of the errors alleged on this trial stems from the alleged prejudice which resulted from the reading to the jury of the information in respect to the three counts which were not proved and later dismissed.

The evidence in respect to what happened at Potrykas' apartment on the morning of April 26, 1974, is derived from the testimony of Scott Girga and Michael Vermilyea.

Count 3, on which Roehl and his codefendant were found guilty, alleged that a cloth "Heaven's Devils" patch was taken from Girga. Girga testified that Potrykas, a fellow "Heaven's Devil," called him to come over to Potrykas' flat to surrender his patch to the "Outlaws," who were there. When Girga entered the Potrykas apartment, he saw Peter Olson, a "Milwaukee Outlaw," pointing a .22 caliber handgun at him. Olson asked Girga for his "Heaven's Devils" patch. Girga testified that he handed over his patch because Olson had the weapon pointed at him. Girga said that he saw Roehl, a "Milwaukee Outlaw," and the defendant in this case, in the apartment. Girga testified that Ponchik, a fellow member of the "Heaven's Devils," arrived shortly thereafter. He saw Roehl pat down Ponchik, apparently in a search for weapons. He saw Olson place the cocked pistol at Ponchik's head, and then saw Roehl strike Ponchik on the side of the head with a glass decanter. This blow caused profuse bleeding, and subsequently

Ponchik was taken to a hospital. Girga testified that he remained in the Potrykas apartment, "Because Peter Olson had a gun on me and nobody was going anywhere." He said he handed over his patch because he was afraid for Robert Potrykas' life. He stated that he turned over his patch because he had no other choice. He testified, however, that he did not recall that Roehl said anything when Olson asked for his patch and he did not at any time see Roehl with a gun. He did, however, see Roehl strike Ponchik with the decanter.

Vermilyea testified that, in response to a call, he too went to Potrykas' flat. When he arrived, Roehl told him to put his patch on the kitchen table. He did so and explained, "Because there was a man standing there bleeding and I saw a gun in Peter Olson's belt, and I was afraid for my life, so I put the patch down." Roehl told Vermilyea that he had been picked up on some charge and wanted $15 toward his bail. Vermilyea gave $3.00, all he had, to Roehl. Vermilyea stated he paid Roehl, "Because . . . I was afraid for my life." Roehl, however, never used force, nor threatened the use of force, in the presence of Vermilyea. Vermilyea made no protest to Roehl, because he saw Ponchik bleeding and saw Olson with a gun in his belt, which Vermilyea thought might have been used to inflict the wound.

Terry Jahnke, who was also a member of "Heaven's Devils," stated that he also was called to the Potrykas apartment, and when he arrived, he gave his patch to Roehl. Roehl also asked for bail money, but Jahnke had no money with him. Although Roehl made no direct threat of force, Jahnke handed over a patch to Roehl, at Roehl's request. He indicated that he was intimidated by Olson. He said that, if he had had any money, he would have handed it over, "because Olson was sitting there in the room, the other room with the pistol. I felt

it was the wiser thing to do, as far as my personal safety was concerned."

It was on these facts that Roehl and his codefendant were found guilty of armed robbery, sec. 943.32(1)(b) and (2), Stats., and as parties to a crime under sec. 939.05. These statutes provide:

"943.32 Robbery. (1) Whoever, with intent to steal, takes property from the person or presence of the owner by either of the following means may be imprisoned not more than 10 years:

"(b) By threatening the imminent use of force against the person of the owner or of another who is present with intent thereby to compel the owner to acquiesce in the taking or carrying away of the property.

"(2) Whoever violates sub. (1) while armed with a dangerous weapon may be imprisoned not more than 30 years."

"939.05 Parties to crime. (1) Whoever is concerned in the commission of a crime is a principal and may be charged with and convicted of the commission of the crime although he did not directly commit it . . . .

"(2) A person is concerned in the commission of the crime if he:

"(a) Directly commits the crime; or

"(b) Intentionally aids and abets the commission of it; or

"(c) . . . ."

The evidence was sufficient to convict Roehl.

The facts revealed at trial indicate that Roehl, with whom we are concerned on this appeal, demanded that the patches and the money be turned over, but he made no direct threats to either Girga or Vermilyea. He did, however, in the presence of Girga, strike Ponchik on the head with a decanter. During the entire episode, Olson was armed with a handgun, and at various times pointed it at one or more members of the "Heaven's Devils," and in the presence of Girga and Roehl held the cocked weapon to Ponchik's head.

It is clear from the undisputed facts that the combined conduct of Olson and Roehl constituted the threat of imminent use of force against the owners of the property for the purpose of compelling the owners to relinquish possession of their property.

Each of the defendants was charged with being "concerned in the commission" of the crime under sec. 939.05, Stats. Because the charge is that of being armed with a .22 caliber revolver, and there is no evidence that Roehl was armed, his complicity under the statute was that of an aider or abettor.

Aiding and abetting has been explained in *Hawpetoss v. State*, 52 Wis.2d 71, 187 N.W.2d 823 (1971). Therein we defined those "concerned in the commission" of a crime and stated:

"The elements of complicity, or aiding and abetting are that a person (1) undertakes conduct (either verbal or overt action) which as a matter of objective fact aids another person in the execution of a crime, and further (2) he consciously desires or intends that his conduct will yield such assistance." (at 78)

In that same case we pointed out that, where one person knew the other was committing a criminal act, he should be considered a party thereto when he acted in furtherance of the other's conduct, was aware of the fact that a crime was being committed, and acquiesced or participated in its perpetration. See also *State v. Nutley*, 24 Wis.2d 527, 129 N.W.2d 155 (1964); *State v. Haugen*, 52 Wis.2d 791, 191 N.W.2d 12 (1971); *Taylor v. State*, 55 Wis.2d 168, 197 N.W.2d 805 (1972); and *State v. Cydzik*, 60 Wis.2d 683, 211 N.W.2d 421 (1973). These cases hold that defendants may be found guilty of being concerned in the commission of a crime if, be-

tween them, they perform all the necessary elements of the crime with mutual awareness of what the other is doing. It is not necessary that each defendant be present at the scene of the crime.

On the basis of the law applicable to aiders or abettors, and on the basis of the evidence adduced at trial, the jury could reasonably have concluded that Roehl was aware of Olson's act of pointing a weapon at Girga and demanding his patch, and that his presence and conduct were for the purpose of assisting Olson.

There was also evidence that Roehl told Vermilyea to put the patch on the kitchen table and also procured money from Vermilyea at a time when Olson was armed with a weapon and when Vermilyea stated he was afraid for his life. There is no doubt, considering the combined conduct of the two defendants, Olson and Roehl, that there was evidence that property was taken from both Vermilyea and Girga, that there was an intent to remove the property from the victims, and that there was a threat implicit in the fact that one of the defendants was armed with a dangerous weapon.

With the exception of the decanter blow to Ponchik, there is no direct proof of Roehl's use of force or threat of force. It is clear, however, that Roehl was acting in conjunction with Olson and was aware of, and was content to utilize for the purpose of assisting the takings, the explicit and implicit threats of force that arose out of Olson's possession and brandishing of the gun.

Moreover, each of the victims, as is evidenced by their testimony, was coerced by the threat of force.

We are satisfied that the jury properly found on the basis of the evidence that Roehl was a party to the crime of armed robbery, and we conclude the conduct of Roehl and Olson satisfied all the statutory requisites of secs. 943.32(1) (b) and (2) and 939.05, Stats.

Roehl also contends on this appeal that he was irretrievably prejudiced because the information which was read to the jury included three counts of armed robbery with respect to which the state was unable to produce supporting witnesses. The trial judge at the commencement of the trial read the five counts of armed robbery set forth in the information.

Just before the trial commenced, the prosecutor obtained a bench warrant for the production of Potrykas, Guehrer, and Ponchik, the alleged victims and key witnesses in respect to Counts 1, 2, and 4. The state had been unable to serve a subpoena on these material witnesses. The record demonstrates that, by the evening of September 17, 1974, the first day of trial, the prosecutor knew that the production of these witnesses could not be obtained even by bench warrant. Nevertheless, the state, although knowing that it could not in all likelihood prove three of the counts in the absence of those witnesses, failed to notify the court and continued with the prosecution, ostensibly on the basis of all five counts.

Count 1, in respect to the theft of the shortwave radio, was dismissed by the judge when the state rested. Shortly thereafter, at the end of the trial—the defense put in no testimony—Counts 2 and 4, in respect to the taking of a patch from Guehrer and Ponchik, were dismissed for lack of proof. Only Counts 3 and 5, in respect to the theft of the patch from Girga and the taking of money from Vermilyea, went to the jury.

Roehl on this appeal contends that permitting the reading of three counts that could not be proved prejudiced the jury. When it became apparent to defense counsel at trial that three counts of the information were almost totally lacking in proof, a motion was made for mistrial on the ground of prosecutorial misconduct.

The trial judge was highly critical of the prosecutor for failing to inform the court and for failing to amend

the information as soon as it became apparent that the necessary witnesses could not be produced. He, however, found no prejudice to the defendants and declined to order a mistrial.

On this appeal, counsel grounds the request for reversal and a new trial on the American Bar Association *Standards Relating to the Prosecution Function and the Defense Function,* sec. 3.9(e), p. 34. That standard provides:

"The prosecutor should not bring or seek charges greater in number or degree than he can reasonably support with evidence at trial."

Counsel's reliance on this section of the *Standards* is misplaced. The purpose of sec. 3.9(e) is set forth in the Commentary to the Prosecution Standards, at 98:

"The chief criticism voiced by defense counsel with respect to the exercise of prosecution discretion in this area is that prosecutors 'overcharge' in order to obtain leverage for plea negotiations. Although it is difficult to give a definition of 'overcharging' in verbal form, it is clear that the heart of this criticism is a belief that prosecutors bring charges not in the good faith belief that they are appropriate under the circumstances and with an intention of prosecuting them to a conclusion, but merely as a harassing and coercive device, in the expectation that a guilty plea will result and that it will not be necessary to proceed to trial, verdict and sentence on all of the charges or at the degree of crime originally stated."

There is no evidence in the instant case that tends to show the charges were not brought in good faith or only brought for the purpose of obtaining a pretrial plea bargain.

The commentary in respect to sec. 3.9(e) of the *Standards* also points out that:

"[A prosecutor] may charge in accordance with what he then believes he can establish as a prima facie case.

If the facts warrant multiple charges growing out of a single episode, the prosecutor is entitled to charge broadly." (at 98)

In the instant case, there seems nothing to criticize in respect to the charges themselves. It seems highly probable that, were the victims produced at trial, the prosecutor could have made a *prima facie* case on each of the counts of the information. There was also testimony at trial which, with only slightly more evidentiary bolstering, could have sustained a conviction in respect to the theft of the patches from Ponchik and Guehrer.

The prosecutorial misconduct was not in respect to the initial charging but, if present, was in respect to continuing the state's case on three counts that the prosecutor knew at the inception of the trial were of doubtful provability and which, by the morning of the second day of trial, he knew, quite clearly, could not be proved. Nevertheless, the prosecutor came into court and put in the remainder of his case without comment or a motion to dismiss the charges that a reasonable prosecutor should have known he could not prove. This, we believe, constitutes misconduct.

Section 5.5 of the *Standards Relating to the Prosecution Function* provides:

". . . It is unprofessional conduct to allude to any evidence unless there is a good faith and reasonable basis for believing that such evidence will be tendered and admitted in evidence."

Although this standard is concerned primarily with utterances by a prosecutor made in an opening statement, it is clear that, at such time as a prosecutor during the course of trial becomes aware that allegations placed before the jury—as they were here by the reading of the information—are no longer susceptible to proof, he has an obligation to withdraw them and to inform the judge

and jury that such charges which cannot be proved are withdrawn and are not to be considered in the case. Moreover, sec. 5.9 of the *Standards* makes it unprofessional conduct for the prosecutor to intentionally refer to facts outside of the record.

While it cannot be said with certainty that the prosecutor knew at the inception of the trial that he had permitted the jury to be confronted with facts that could not be placed in the record, by the morning of the 18th he knew that such facts, which had been read to the jury, could not be proved. It was then his obligation to correct the error that had occurred. We accordingly conclude that such unprofessional conduct of counsel constituted error. We conclude, however, that this conduct did not result in prejudice to the defendant.

In *Gelhaar v. State,* 58 Wis.2d 547, 207 N.W.2d 88 (1973), we pointed out that whether conduct of a district attorney constituted prejudicial error was a question of fact. We said therein, at 562, referring to *Harris v. State,* 52 Wis.2d 703, 191 N.W.2d 198 (1971):

". . . it is a question of fact as to whether remarks of witnesses or attorneys are sufficiently prejudicial to warrant a new trial.

". . .

" 'In such determinations, the curative effect of the court's admonition to the jury to disregard the evidence may be considered.' "

In the instant case, the jury was repeatedly informed by the judge that the information was a charge only and was not to be considered evidence of guilt. Moreover, the jury was twice instructed before its deliberations that three of the charges had been dropped from the information and were not to be considered in respect to the remaining charges.

■

We have frequently said that possible prejudice to a defendant is presumptively erased from the jury's collective mind when admonitory instructions have been properly given by the court. *State v. Jennaro,* 76 Wis.2d 499, 251 N.W.2d 800 (1977); *State v. Lindsey,* 53 Wis.2d 759, 766, 193 N.W.2d 699 (1972); *Taylor v. State,* 52 Wis.2d 453, 457, 190 N.W.2d 208 (1971).

It is specifically argued that the reading of the information prejudiced Roehl because Count 4, in respect to the robbery of Ponchik, was subsequently dismissed for lack of proof and yet evidence in regard to Ponchik was admitted without objection because, at that juncture of the trial, defense counsel could assume that Ponchik would testify.

■

It is claimed that the evidence that Roehl struck Ponchik with the decanter was highly prejudicial to Roehl and that such evidence would have been inadmissible had there been no charge concerning Ponchik. We disagree with defense counsel's conclusion with respect to admissibility. At the stage the evidence was offered, such evidence was not only admissible in respect to a theft from Ponchik, but additionally was admissible, and continued to be admissible, in respect to force used by Roehl. The blow to Ponchik continued to be of significance, because it demonstrated to the victims of the two remaining counts that Roehl was ready and willing to use force in aiding and abetting an armed robbery. We cannot conclude that the evidence in respect to Roehl's striking Ponchik would have been inadmissible even though Count 4, in respect to Ponchik, had not been brought at all.

■

Although we conclude that the action of the prosecutor constituted misconduct, the admonitory instructions of the trial judge cured any prejudicial effect which would otherwise have resulted from the reading of the infor-

mation on charges that were dismissed because of the state's failure to produce the essential witnesses.

Additionally, Roehl on this appeal argues that the instructions were erroneous because the court failed to instruct on a lesser included offense of theft from the person, sec. 943.20 (1) (a) and 3 (d) (2), Stats. He also argues that the instructions on the elements of armed robbery which referred to Olson and Roehl in the conjunctive were erroneous. We find, however, from a perusal of the record, that neither alleged error was objected to at trial. The A.B.A. *Standards Relating to Trial by Jury*, sec. 4.6 (c), at 12, provides:

". . . No party should be permitted to raise on appeal the failure to give an instruction unless he shall have tendered it, and no party should be permitted to raise on appeal the giving of an instruction unless he objected thereto . . . ."

This general rule that there is no right to raise an error where there has been a waiver in the trial court is well established in Wisconsin law. *State v. Davis,* 66 Wis.2d 636, 658, 225 N.W.2d 505 (1975); *Lampkins v. State,* 51 Wis.2d 564, 187 N.W.2d 164 (1971). We have, nevertheless, recognized that, even though appropriate requests and objections have not been made, this court may reverse if the interests of justice as defined in sec. 251.09, Stats., so require. It is clear that the objections were not raised and that the waiver rule applies in the instant case in respect to Roehl. The record shows that Roehl's trial counsel at no time asked for an instruction on theft *from the person.* Counsel for Roehl stated, "I am asking for a lesser included instruction on theft not of person, just theft, 943.20."

It is not the failure to give this instruction of which counsel complains on appeal. Rather, he complains that

another instruction, never requested by Roehl's counsel, was not given. The issue which counsel now seeks to have considered—whether an instruction of theft from the person should have been given—was not raised by Roehl at trial and will not be considered on this appeal.

The court gave the following instructions, which are now objected to because Roehl and Olson were referred to in the conjunctive:

"As to Count 3, if you are satisfied beyond a reasonable doubt from the evidence in this case that Scott J. Girga had possession of the heretofore described property . . . that the Defendants Peter Olson or Thomas Roehl, and/or both intentionally took the . . . property from the person of Scott J. Girga, and that at the time of such taking . . . the Defendants, Peter Olson or Thomas Roehl, and/or both of them, did this while armed with a dangerous weapon, then you should find the Defendants, Peter Olson or Thomas Roehl, and/or both of them guilty of armed robbery as charged.

"If, however, you are not so satisfied, then you must find the Defendants, Peter Olson or Thomas Roehl, and/or both of them not guilty of armed robbery."

The judge gave the same sort of instruction as to Count 5. He gave Wisconsin Jury Instruction—Criminal 400, parties to crime, aider and abettor, and then instructed the jury that:

"It will be your duty to determine, as to each Defendant, whether that Defendant is guilty of one, two or neither of the offenses charged in the information. While the Defendants are being tried jointly, it nevertheless becomes your solemn duty to judge the guilt or innocence of each Defendant separately, and, at the close of these instructions, the Court will submit to you separate verdicts regarding the guilt or innocence of each Defendant.

"Your verdict as to one Defendant may, but need not necessarily, be the same as that reached for the other Defendant."

It is conceded that counsel for Roehl did not ask for different instructions and did not object to the instructions that were given. After the verdicts were prepared, the court asked Roehl's counsel whether there were any alterations or corrections to be made in the instructions or whether there were any omissions. Counsel responded, "No." The acceptance by trial counsel of these conjunctive instructions is conceded by counsel on this appeal. Nevertheless, where an instruction is erroneous as a matter of law, and fundamentally misinstructs the jury in respect to the law, this court will consider even an unobjected to instruction on appeal. We find no such error here.

While, as a matter of semantics, the phrase repeatedly used, "Peter Olson or Thomas Roehl, and/or both of them," is ackward, we do not find it prejudicial or erroneous as a matter of law. Eight verdict forms were submitted to the jury, and each of them required an individual determination of guilt or innocence in respect to each defendant. Additionally, the jury was admonished to determine the guilt or innocence of each defendant separately, and it was told that the verdict as to one defendant need not be the same as that for the other defendant.

The language this court used recently in *State v. Jennaro*, 76 Wis.2d 499, 251 N.W.2d 800 (1977), is appropriate here:

"... the admonitions and instructions of the judge alerted the jury that the testimony elicited could be probative of the guilt of one defendant but not necessarily of the other, and that the guilt of each defendant was to be considered on an independent basis. The instructions repeatedly referred to each defendant in the singular, and there is no intimation in the instructions to the jury that any of the evidence was to be applied in a blanket fashion to both defendants."

We conclude that the objections to the instructions in respect to a lesser-included offense and in respect to charging in the conjunctive were unobjected to by Roehl and that the instructions as given to the jury did not constitute an erroneous or misleading statement of the law.

Counsel for both Roehl and Olson, after closing argument, moved for a mistrial, because of an allegedly constitutionally impermissible comment by the prosecutor on the defendants' failure to testify. The record shows that, after the close of all arguments, Olson's counsel moved for a mistrial, stating:

"During counsel for the State's closing argument . . . there was mentioned by him that certain matters were uncontroverted. At that time I made an objection and the Court Reporter was called out and I indicated at that time what I was objecting to. We approached the side of the bench and I moved for a mistrial at that time. I don't believe the reporter took and the Court indicated I could make a record at a time subsequent to that time."

The court denied the motion for mistrial, stating that, although it was impermissible for the prosecutor to comment on the defendants' failure to testify, he could comment on the evidence. The trial judge said, "He did not refer in any way to the Defendants not taking the witness stand."

The record in this case does not contain a transcript of the closing argument. Counsel may ask the trial court to direct that closing arguments be reported. Sec. 256.-55(3), Stats. This court will not consider alleged errors in arguments when it cannot determine exactly what was said. This it can do only when the argument has been transcribed or when counsel have stipulated to the verbiage of the questioned statement. *Rodenbeck v. American Mutual Liability Insurance Co.*, 52 Wis.2d 682, 685, 190 N.W.2d 917 (1971); *Beck v. Fond du Lac*

*Highway Committee,* 231 Wis. 593, 286 N.W. 64 (1939) ; *State v. Tew,* 54 Wis.2d 361, 195 N.W.2d 615 (1972).

In this case there is no explicit concession in respect to what the prosecutor stated. Since counsel did not preserve the record, we are obliged to rely on the trial judge's finding that the prosecutor did not refer in any way to the defendants' failure to take the stand. Accordingly, we find no error that can be supported by the record. There is no evidence that the prosecutor in his closing argument implied that it was the duty of a defendant to testify and that the failure to do so constituted an admission of guilt. There is no showing that the defendant's privilege against self-incrimination was infringed.

The arguments of both the state and the defense in respect to the sentences imposed are bizarre.

Defense counsel argues that the sentences imposed were excessive because the criminal conduct was a private altercation between motorcycle clubs and, therefore, the public safety was not threatened.

The state, particularly in oral argument, asserted facts not found in the record that the defendants were engaged in a course of conduct to intimidate witnesses, to destroy private property, and to disrupt the peace and engage in a reign of terror, and hence the sentences were not excessive, but lenient.

The mere statement of these disparate and extreme positions, both completely unsupported by the record, is indicative of their absurdity. We cannot merely on the basis of the unsubstantiated assertions of the state, which appear in its brief and in the course of oral argument, uphold the sentences. Nor can we minimize the conduct and hold that the sentences were excessive because neither of the two groups involved, the "Milwaukee Outlaws" and the "Heaven's Devils," is highly

regarded by society or by law enforcement officials. Rather, we are obliged to determine whether, on the basis of the record, the sentences are excessive.

In this case, the only information at sentencing proffered by Roehl's counsel was in respect to the gravity of Roehl's prior criminal record. The trial judge, with almost no supporting reasons, stated that he thought that Roehl and Olson were equally culpable, that they acted in concert, and that, therefore, they should be given the same sentence on each of the two counts. Accordingly, each of them was sentenced to two concurrent seven-year terms.

The sentences in this case were imposed the day after trial. At sentencing the judge failed to demonstrate a reasoned exercise of discretion, and no presentence investigation report was put in the record or referred to.

In *McCleary v. State,* 49 Wis.2d 263, 282, 182 N.W.2d 512 (1970), we stated:

". . . the failure to exercise discretion (discretion that is apparent from the record) when discretion is required, constitutes an abuse of discretion. We will not, however, set aside a sentence for that reason; rather, we are obliged to search the record to determine whether in the exercise of proper discretion the sentence imposed can be sustained. It is not only our duty not to interfere with the discretion of the trial judge, but it is, in addition, our duty to affirm the sentence on appeal if from the facts of record it is sustainable as a proper discretionary act."

Looking at the record *ab initio,* we are satisfied that the trial judge, although he failed to follow the clear mandate of *McCleary,* did not abuse his discretion in the imposition of sentences. The record indicates that Roehl was not a first offender. He was brought from prison for trial. Furthermore, his concurrent seven-year terms

were made consecutive to a prison term that he was then serving. The record shows that the court had the criminal record of Roehl before it, and the district attorney referred to two convictions which Roehl's trial attorney acknowledged caused his then imprisonment at the State Prison. In addition, the crime with which he was charged was armed robbery, an offense this court has recognized as one of the most serious in the Wisconsin penal code. The two crimes of which Roehl was found guilty carried with them the possibility of a sentence of thirty years on each count—a potential total of sixty years. This court has held that a sentence, even up to the maximum, may be imposed to emphasize society's concern with the seriousness of a crime. *Cheney v. State,* 44 Wis.2d 454, 171 N.W.2d 339, 174 N.W.2d 1 (1969); *Bastian v. State,* 54 Wis.2d 240, 194 N.W.2d 687 (1972).

In view of the maximum sentence that could have been imposed and the defendant's history of criminality, counsel's argument, that the seven-year sentences were *per se* excessive, is unsupportable. Counsel's principal argument seems to be that society should not be particularly concerned with these offenses because they were private acts between two unruly motorcycle clubs and, therefore, the public safety was not threatened. The record does not support this position; and, as stated above, the mere fact that in this case neither the victim nor the criminal is a part of society's mainstream does not mitigate the seriousness of the offense. The harm is not solely to the victim but is an offense against the peace and dignity of the State of Wisconsin. Under the rationale of defense counsel, armed robbery under some circumstances should be lightly punished, if punished at all. This philosophy comports neither with the facts of this case nor with any reasonable standards of law enforcement.

We conclude that the sentences imposed on Roehl were, under the circumstances, appropriate and did not constitute an abuse of discretion.

It is also argued that in view of the record as a whole a new trial should be granted in the interest of justice. This court has the authority under sec. 251.09, Stats., to grant new trials where it appears from the record that the real issues were not tried or it is probable that justice has for any reason miscarried. In *Lock v. State,* 31 Wis.2d 110, 118, 142 N.W.2d 183 (1966), this court stated:

"In order for this court to exercise its discretion and for such a probability to exist we would at least have to be convinced that the defendant should not have been found guilty and that justice demands the defendant be given another trial."

Stated another way, a new trial will be granted only where it appears probable from the record that there would be a different result on retrial if a trial were held under optimum conditions. *Garrella v. State,* 61 Wis.2d 351, 212 N.W.2d 101 (1973). Although there was evidence of some error in the course of the trial, we concur in the trial judge's finding that such error was not prejudicial to the defendant and a retrial, absent error, would in all probability provide even more convincing evidence of the defendant's guilt. We decline to reverse in the interest of justice.

The briefs claim additional evidentiary errors. Particularly, it was argued that evidence should have been permitted to show Ponchik's propensity to violence. Such evidence, although admitted, would have been irrelevant to the issues in this case. The brief of the defendant also argues that the court committed error in respect

422

to reading portions of the testimony to the jury. That argument was specifically withdrawn during the course of the oral argument.

*By the Court.*—Judgment and order affirmed.