STATE of Wisconsin, Plaintiff-Respondent,

v.

Forrest S. SCHALLER, Defendant-Appellant.†

Court of Appeals

*No. 94–1216–CR. Submitted on briefs February 3, 1995.—Decided December 28, 1995.*

(Also reported in 544 N.W.2d 247.)

†Petition to review denied.

24

For the defendant-appellant the cause was submitted on the briefs of *Charles Bennett Vetzner,* assistant state public defender.

For the plaintiff-respondent the cause was submitted on the brief of *James E. Doyle,* attorney general, with *Marguerite M. Moeller,* assistant attorney general.

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

EICH, C.J. Forrest Schaller appeals from judgments convicting him of four counts of second-degree sexual assault and one count each of third-degree sexual assault, false imprisonment, criminal damage to property and battery, and from an order denying his postconviction motions. The charges stemmed from a series of incidents occurring on a single night and day involving Schaller and his estranged wife, K.S.

He argues that his convictions should be reversed because: (1) the trial court improperly refused to order K.S. to submit to examination by a psychiatrist or psychologist of his choosing; (2) he was denied his right to confront witnesses and present a defense when the court barred him from calling K.S. as his own witness to question her about an alleged extramarital relationship; (3) evidence that he had physically abused one of his children was improperly admitted; and (4) some jurors had seen a television report of the trial which included a brief view of Schaller at his initial court appearance wearing jail clothing and shackles. We reject his arguments and affirm the convictions.

On August 16, 1991, Schaller and K.S. had an argument outside a tavern over K.S.'s affair with a friend of Schaller's a few weeks earlier. Schaller followed K.S. to her home, where a series of sexual and physical encounters ensued throughout the evening and the next morning. When Schaller left, K.S. called the police and the district attorney, requesting that charges be filed. Several days later, however, she wrote to the district attorney asking that the charges be withdrawn and stating that all of the incidents occurring between them on August 16 and 17 had been consen-

sual. The following spring, she asked that the dismissed charges be refiled, and they were.

At trial, K.S. testified that the several incidents of sexual and physical contact on August 16 and 17, 1991, were nonconsensual and that disavowal of the assaults in a letter to the district attorney was a lie. The jury found Schaller guilty of all charges, and he appeals. Other facts will be discussed in the body of the opinion.

## I. *The Request for a Psychological Examination*

Prior to trial, Schaller sought an order requiring K.S. to be examined by a psychologist or psychiatrist of his choosing. He argued to the court that the prosecution was intending to offer "some sort of argument regarding . . . what I think is referred to as a battered-wife syndrome," and that while he did not know whether the State intended to offer any expert testimony on the point, and had "not found any cases one way or the other on this particular issue," he should be allowed the "opportunity to explore [it]." The trial court denied the motion.

Schaller renewed the argument in his postconviction motions, claiming that he was entitled to a new trial because the prosecution had presented the testimony of expert witnesses who had "examined" K.S. and testified either that she suffered from "battered wife's syndrome" or that her conduct in first accusing Schaller of the assaults and then recanting her accusations was consistent with that of women in abusive relationships. Citing *State v. Maday*, 179 Wis. 2d 346, 507 N.W.2d 365 (Ct. App. 1993), a case we discuss at some length below,[1] Schaller argues that without an expert

---

[1] *State v. Maday*, 179 Wis. 2d 346, 507 N.W.2d 365 (Ct. App. 1993), had not been decided at the time of Schaller's trial.

of his own to testify on the subject, he was denied a fair trial.

The prosecutor argued in opposition to Schaller's motion that the State's witnesses testified not as psychological or psychiatric experts but as experts on domestic violence, and that their testimony did not relate to any "diagnosis" or evaluation of K.S.'s psychological condition but only to their experience with abused women, for whom recantations or denials are not uncommon.

The trial court denied the motion, characterizing the challenged testimony as a simple explanation of why a woman in K.S.'s position might "be willing to recant [her] story," and ruling that Schaller had not provided sufficient reasons, under *Maday* or any other authority, for ordering an examination.

Schaller argues on appeal, as he did in the trial court, that given the testimony of the State's "expert witnesses," he could not have a fair trial without being provided an opportunity to have his own experts examine and evaluate K.S. The State says that Schaller mischaracterizes the challenged testimony—that none of its witnesses testified either that they had examined K.S. or that she had exhibited behavior consistent with that of women diagnosed as suffering from battered women's syndrome.

Generally, if the mental capacity of a witness is at issue in a case, a psychological or psychiatric examination of the witness may be ordered, in the discretion of the trial court, if " 'strong and compelling' " reasons are present. *State v. Lederer*, 99 Wis. 2d 430, 439, 299 N.W.2d 457, 463 (Ct. App. 1980) (quoted source omitted). Schaller does not argue that the trial court erroneously exercised its discretion in denying his

request; rather, he claims that *State v. Maday* compels reversal as a matter of law. A discretionary decision resting upon an error of law is, of course, beyond the limits of judicial discretion. *v. Wyss*, 124 Wis. 2d 681, 734, 370 N.W.2d 745, 770 (1985).

The challenged testimony came from three prosecution witnesses. The first, Ronald Schafer, a psychologist who had met with K.S. a few days prior to trial "[t]o do an evaluation of her present functioning and of her past experiences," stated that, in his experience, a common characteristic of battered women is that they "[p]resent[ ] a passive face to the world but ha[ve] the strength to manipulate [their] environment," and that it would be "consistent with [that] characteristic . . . [t]hat a woman would lie to police about an event that she herself had experienced, or lie to a prosecutor or defense attorney." He also testified that it would be "consistent . . . for a wife who has been the victim of a rape by her husband to collaborate with the husband [and others] to recant and explain away the rape so as to make it appear as an innocent or wanted sexual act," and also to "avoid opportunities for escape."

The second prosecution witness was Julie Ann Foley-Hessefort, who saw K.S. when she was brought to the hospital the day of the assaults. Foley-Hessefort also worked as a "counselor and outreach worker" at a battered women's shelter and as the coordinator of a domestic violence intervention project. She testified that it is "common, very common" for women "who have been the victim[s] of violent acts in a relationship to later minimize or recant [assault accusations]."

The third witness was Jane Mather, who has a degree in social work and is the victim-witness coordinator for La Crosse County, the "liaison" between

victims and witnesses and the prosecutor's office. Mather talked to K.S. on the telephone and in person on two or more occasions, explaining the functions of her office and listening to K.S.'s description of the assaults. The testimony to which Schaller objects came in response to the prosecutor's question whether it was "common or uncommon for women who have been the victim of violent acts in a relationship to minimize or recant . . . their statements." Mather replied: "It's very common."

Schaller argues that the testimony of those three witnesses is precisely the type of evidence that should cause us, following *Maday*, to reverse his conviction and order a new trial.

In *Maday*, the prosecution notified the court and the defendant that it intended to introduce evidence generated by a "psychological examination" of the victim by the State's experts that the behaviors exhibited by two child victims of sexual assault "were consistent with the behaviors of sexual abuse victims that the experts had dealt with in the past." *Maday*, 179 Wis. 2d at 349, 350, 507 N.W.2d at 367, 368. The trial court denied Maday's motion to require the children to submit to a psychological examination by his own experts, and we granted leave to appeal the interlocutory order.

Maday argued on appeal that he would be greatly disadvantaged at trial by the court's ruling because "the jury will give greater credence to the testimony of the state's experts because they personally interviewed the victims" and would be prone to disbelieve his own experts because they would not be able to "develop their clinical impressions from a one-on-one interview of the victims." *Id.* at 355-56, 507 N.W.2d at 370. We agreed with Maday's position:

We are not convinced that the responsive mechanisms available to Maday are a satisfactory substitute for . . . clinical interviews of the victims. Generally, "[m]ost psychiatrists would say that a satisfactory opinion can only be formed after the witness has been subjected to a clinical examination." Recently, the Illinois Supreme Court . . . noted that "[a]n expert who has personally examined a victim is in a better position to render an opinion than is an expert who has not done so." Finally, our supreme court [in *Schleiss v. State*, 71 Wis. 2d 733, 746, 239 N.W.2d 68, 76 (1976)] has noted that pretrial review of written material and observation of the victim during trial are inadequate foundations for a psychologist's opinion; a definitive opinion requires an extensive interview plus review of material on the victim's life and behaviors.

*Id.* at 356-57, 507 N.W.2d at 370 (quoted sources omitted; citations omitted).

Because we felt that a defendant who is prevented from presenting testimony from an "examining expert" when the state is able to offer such testimony "is deprived of a level playing field," we concluded,

When the state manifests an intent during its case-in-chief to present testimony of one or more experts, who have personally examined a victim of an alleged sexual assault, and will testify that the victim's behavior is consistent with the behaviors of other victims of sexual assault, a defendant may request a psychological examination of the victim.

*Maday*, 179 Wis. 2d at 357, 359-60, 362, 507 N.W.2d at 370, 372.

In such a situation, and where the defendant so requests, "present[ing] the court with evidence that he or she has a compelling need or reason for the . . .

33

examination[ ]," the trial court may, in its discretion, grant the request, after considering various factors, including (among others) the intrusiveness inherent in the examination and its effect on the victim, its probative value to the issues before the court, and the evidence otherwise available for the defendant's use. *Maday*, 179 Wis. 2d at 360, 507 N.W.2d at 372.

Schaller claims that, as in *Maday*, the State's witnesses in this case "all had professional interaction with [K.S.]," and that his expert—and his defense—would be severely handicapped in countering their testimony without "direct contact with the purported victim," to the extent that he could not receive a fair trial. We disagree.

This case is not like *Maday*, where the State's witnesses had conducted "psychological examinations"— or even "psychological interviews"—with the victim; nor is it claimed here, as it was in *Maday*, that the State's evidence "place[d] the victim's mental condition and behavior in issue." *Maday*, 179 Wis. 2d at 350, 352, 355, 507 N.W.2d at 367, 368, 370. Neither Schafer nor the other witnesses testified that they had "examined" K.S. or diagnosed her condition; nor, significantly, did any of them testify that their observations of K.S. during "clinical interviews" were, in their opinion, "consistent with the behaviors of sexual abuse victims," as did the witnesses in *Maday*. *Id.* at 350, 356, 507 N.W.2d at 368, 370.

Although Schafer had met with K.S. on one occasion prior to the trial to "evaluat[e] . . . her present functioning and . . . her past experiences," he never testified as to the nature of his meeting with her, or what examinations he may have made or what evaluations or diagnoses he may have arrived at. Indeed, on Schaller's own motion, the court had specifically barred

any such evaluative or diagnostic evidence.[2] Schafer simply described the recognized characteristics of women in abusive relationships and stated, in response to counsel's question, that lying to authorities and recanting accusations would be consistent with those characteristics.

The same may be said for the testimony of Foley-Hessefort and Mather. Both women—neither of whom is a psychiatrist or psychologist—saw K.S. briefly in their roles as a hospital social worker and a victim-witness coordinator. They stated that, in their experience with cases of domestic violence, it is common for women in abusive domestic relationships to minimize or recant accusations of assault by their partners. *Maday* does not support reversing the trial court's denial of Schaller's request for a psychiatric or psychological examination of K.S.

Indeed, the testimony of the three witnesses in this case is strikingly similar to that which we ruled admissible in *State v. Bednarz*, 179 Wis. 2d 460, 507 N.W.2d 168 (Ct. App. 1993). *Bednarz* was a battery prosecution brought against the victim's boyfriend in which, as K.S. did here, the victim recanted her initial accusations. An expert on domestic violence testified for the State that a woman who is a victim of domestic abuse "may change her story in an attempt to exonerate the abuser," and we concluded that the testimony was proper. *Id.* at 464, 507 N.W.2d at 170. We noted first that under *State v. Haseltine*, 120 Wis. 2d 92, 352

---

[2] Prior to trial, Schaller moved in limine to bar the State from offering any evidence that K.S. had been examined by a psychiatrist or psychologist or that she "suffers from post-traumatic stress syndrome, battered wife syndrome, battered spouse syndrome or any other similar mental condition." The court granted the motion.

N.W.2d 673 (Ct. App. 1984), and similar cases, no witness, expert or lay, may testify that another competent witness " 'is telling the truth' "; and we emphasized that had the expert in *Bednarz* testified that the victim had recanted *because* she was a person suffering from battered women's syndrome *or* some similar condition, it would violate *Haseltine* because "[s]uch a statement would have been a comment that [the victim]'s recantation was untrue." *Bednarz*, 179 Wis. 2d at 464-65, 507 N.W.2d at 171. We went on to contrast that situation with the one at hand, concluding as follows:

> The correct parameters of expert opinion testimony in this area were laid out in *State v. Jensen*, 147 Wis. 2d 240, 257, 432 N.W.2d 913, 920 (1988). The expert may describe the behavior of victims of the same type of crime. The expert may also be asked to describe the behavior of the complainant. Then the expert may be asked if the complainant's behavior is consistent with the behavior of other victims.
>
> Here, the expert testified about the behavior of victims of the same type of crime, but was not asked about the behavior of the complainant or for an opinion on consistency. Rather, it appears that the state was content to let the facts speak for themselves and have the jury determine whether [the victim]'s behavior was consistent with the behavior of those who have the battered woman's syndrome.

*Id.* at 465, 507 N.W.2d at 171 (citations omitted).

While *Bednarz* did not involve a request for a psychiatric examination to counter the State's evidence testimony, we think the case is instructive, for it illustrates that such evidence as the expert gave in that case, like the testimony at issue here, is *not* evidence that the victim suffers from a specific medical or psy-

36

chological condition—or even that the victim's behavior as observed by the experts was consistent with the behavior of women suffering from such a condition. It is simply testimony, based on the witnesses' experience in cases of domestic violence, that women with a history of domestic abuse often exhibit common traits, among them denial and a tendency to recant accusations of abuse. As in *Bednarz*, it was left to the jury in this case to determine whether K.S.'s behavior was consistent with the behavior described by the witnesses. We agree with both the State and the trial court that had Schaller desired to introduce his own expert testimony on the traits and behaviors commonly observed in abused women, his witnesses could have done so—as did Schafer, Foley-Hessefort and Mather—without conducting a "clinical examination" of K.S., and their ability to testify to such general propositions would not have been disadvantaged by their inability to conduct such an examination.

We conclude that the trial court properly exercised its discretion in denying Schaller's motion for a psychiatric examination of the victim in this case, and *Maday* does not compel a different result.

## II. Evidence of K.S.'s Marital Infidelities

As we noted above, the incidents giving rise to the charges against Schaller followed an argument with K.S. over her relationship with one of his friends. Prior to trial, Schaller's attorney indicated that he wanted to introduce evidence that it was then that K.S. first told Schaller that she had had a brief affair with the other man a few weeks earlier. After an in-court discussion concerning the applicability of the rape-shield law's prohibition against evidence of a rape victim's prior

sexual experience, the prosecutor agreed that such limited testimony could come in to help explain Schaller's state of mind that evening and the events that followed. Pursuant to the agreement, K.S. testified that, approximately a month prior to the assault, she had an affair with another man, that it was a "one-night stand," and that she had not been unfaithful to Schaller prior to that time. During the trial, K.S. told a member of the prosecutor's staff that she had also had a sexual encounter with the same man four years earlier, and the prosecutor so advised defense counsel.

Schaller then sought to call K.S. as his witness, to impeach her with the evidence of the earlier affair and also to allow the jury to "hear[ ] the entire story." Opposing the motion, the prosecutor argued (among other things) that evidence of the 1991 affair was stipulated to as relevant to Schaller's state of mind with respect to the events occurring on the night in question, and that evidence of an affair occurring in 1987—of which Schaller had no knowledge on August 16 and 17, 1991—could have no bearing on Schaller's state of mind at that time.

The trial court agreed and denied Schaller's request, noting first that they were there to try "an incident that occurred in 1991" and not to "try[ ] everything that happened with everybody else," and concluding:

> I've allowed some testimony regarding some other acts, because it does have some bearing on what occurred on the date in question. But, frankly, I think we're getting pretty doggone remote.
>
> There's no evidence whatsoever that on the night in question Mr. Schaller had any knowledge of whatever occurred between Mrs. Schaller and the

other individual back in '87. It can't have anything to do with his state of mind in '91.

Then, recognizing that the evidence of the earlier affair "may have some minimal relevancy regarding [K.S.'s] credibility," the court concluded that its probative value was outweighed by the danger of unfair prejudice to the prosecution.

The admission or rejection of evidence is discretionary with the trial court, *State v. Alsteen*, 108 Wis. 2d 723, 727, 324 N.W.2d 426, 428 (1982),

> [a]nd where the record shows that the court looked to and considered the facts of the case and reasoned its way to a conclusion that is (a) one a reasonable judge could reach and (b) consistent with applicable law, we will affirm the decision even if it is not one with which we ourselves would agree.
>
> It need not be a lengthy process. While reasons must be stated, they need not be exhaustive. It is enough that they indicate to the reviewing court that the trial court "under[took] a reasonable inquiry and examination of the facts" and "the record shows that there is a reasonable basis for the . . . court's determination." Indeed, "[b]ecause the exercise of discretion is so essential to the trial court's functioning, we generally look for reasons to sustain discretionary decisions."

*Burkes v. Hales*, 165 Wis. 2d 585, 590-91, 478 N.W.2d 37, 39 (Ct. App. 1991) (citation and quoted sources omitted).

The trial court's decision meets those standards. The court could reasonably conclude that the evidence was so lacking in probative value as to Schaller's state of mind on the night in question, or even as to K.S.'s

39

credibility, as to be either wholly irrelevant or, if minimally relevant, plainly outweighed by the danger of unfair prejudice to the State's case.[3]

---

[3] Schaller maintains that the evidence went well beyond K.S.'s credibility and was essential to his defense for other reasons, which he explains as follows:

> The excluded evidence could have raised doubts about [K.S.]'s ability to perceive and recall sexual episodes to a level which may well have precluded a conviction. As a matter of common sense, any rational juror would lack confidence in a witness who claimed to have been faithful in a marriage until 1991 when she had actually been unfaithful in 1987. . . . [Her] credibility in this area would have been decimated by claiming that she had a sexual liaison with a third party only once when she actually had at least two such experiences with the person.

According to Schaller, "[w]ithout the right to show the accuser was not an accurate historian about her own sexual episodes, the defendant could not possibly convince the jury that the criminal accusations here, too, were unreliable."

We fail to see the difference. However worded or embellished, it is a credibility argument and the trial court did not erroneously exercise its discretion in rejecting it. We agree with the State that K.S.'s inability to recall an incident that occurred six years prior to the trial has little, if any, relevance to whether, as Schaller argues, she was unable to tell the difference between consensual and nonconsensual sexual acts on the night and morning in question. While the prejudice likely to flow from admission of evidence of a second incident of marital infidelity might not be great, the trial court's discretionary determinations are not tested by some subjective standard, or even by our own sense of what might be a "right" or "wrong" decision in the case, but rather will stand unless it can be said that no reasonable judge, acting on the same facts and underlying law, could reach the same conclusion. *State v. Jeske*, 197 Wis. 2d 906, 914, 541 N.W.2d 225, 228 (Ct. App. 1995). We cannot so conclude on this record.

## III. Evidence of Schaller's Abuse of One of His Children

Considerable evidence was received at trial on Schaller's abuse of K.S. in the past, and he does not challenge admission of that evidence. He claims, however, that the court erred in allowing evidence of an instance in 1990 when he physically abused one of his children in a public park.

Prior to the trial, the prosecution sought the court's permission to introduce evidence of the incident, arguing that, as a result of the nature of K.S.'s relationship with Schaller, she lied to the police in order to protect him when the child-abuse incident was being investigated in 1990, just as she did in 1991 when she initially recanted her accusations of the assaults of which he eventually was convicted. The trial court granted the prosecution's request and Schaller concedes the admissibility of evidence of the incident. He argues, however, that in addition to K.S., the State called two other witnesses to the incident who described his actions in much more detail and that, under the circumstances, the "additional" testimony was highly prejudicial.

K.S. testified that while she, Schaller and their daughter, then ten years old, were in the park, Schaller became angry at the little girl and "grabbed [and] . . . pulled her physically . . . and shook her like he shook me." The other two witnesses were Nancy and Tom Kleinschmidt, who were in the park that day and observed the incident. Nancy Kleinschmidt said that she "saw a large man picking up a little girl by the neck and by the shirt and slapping her, and he hit her back and forth a few times in the face and head." She said that the girl was screaming and that by the time her husband and another man intervened, Schaller "had

thrown her up against the van and was still hitting her." Tom Kleinschmidt described the incident in a similar vein, noting that Schaller was "beating the hell out of his little daughter," holding her by the neck, shaking her and throwing her against the van, "slapping her . . . back and forth."

Seeking to bar the Kleinschmidts' testimony, Schaller argued to the trial court that to allow them to elaborate on K.S.'s own version of the incident would be unfairly prejudicial, for it would only serve to emphasize and highlight the incident in the jury's mind. The prosecutor maintained that the evidence was a proper response to the defense's attempt to discredit K.S.'s testimony by emphasizing that no medical treatment had been obtained for the child and suggesting that because no charges were brought against him as a result of the incident, K.S.'s description of it was unfounded.[4]

The trial court agreed with the State's characterization of K.S.'s description of the incident as "ambiguous," and the testimony of other witnesses as "clarify[ing] the ambiguity." The court also noted that "there already have been enough allegations of child

---

[4] In arguing the point to the court earlier in the trial, the prosecutor stated that testimony about the incident was highly relevant because it showed that even though Schaller's treatment of the child was serious enough that several people visiting the park on that day reported it to the police, K.S. nonetheless lied about the incident in order to exonerate Schaller from any liability for the act "because of the nature of her relationship with [him]." The prosecutor argued that the incident was significant in that it constituted "a powerful example of her covering for Mr. Schaller by lying to the police to protect him" just as she did in 1991 when she recanted her initial accusations against him for the sexual assaults.

abuse flying around, and some by the defense, that I don't think that the mere fact that quote 'child abuse' unquote is involved is so prejudicial to this jury that they can't reach a fair and impartial verdict." The court considered the evidence to be relevant on the "severe issues of credibility" raised in the case and concluded that, in light of the record, any possible prejudice to Schaller would be outweighed by the probative value of the evidence.

Under the standards we have discussed above, the trial court did not erroneously exercise its discretion in allowing the evidence. As the State has argued, the evidence illustrates the extent to which K.S. would go to extricate her husband from a potential criminal prosecution, and could thus assist the jury in evaluating whether she was being truthful when she later recanted the sexual assault charges against him. Under the State's theory of the case, K.S.'s own brief and dispassionate description of the incident, contrasted with that of the other witnesses, also suggests the degree to which—even years later and in the midst of the sexual assault trial—K.S. still had a tendency to minimize the seriousness of Schaller's violent and abusive conduct.

Finally, the trial court gave a cautionary instruction to the jury on the subject, referring specifically to evidence "that the defendant allegedly struck and harmed his wife or children, or both, on prior occasions," and admonishing the jury that it could not use such evidence "to conclude that the defendant has a certain character or a certain character trait and . . . acted in conformity with that trait or character with respect to the offense charged in this case." The court twice told the jury that the evidence was received solely

on the issue of K.S.'s consent to the 1991 sexual assaults, and was to be used for no other purpose. In *State v. Kennedy*, 105 Wis. 2d 625, 641, 314 N.W.2d 884, 891 (Ct. App. 1981) (quoting *Roehl v. State*, 77 Wis. 2d 398, 413, 253 N.W.2d 210, 217 (1977)), we recognized that " 'possible prejudice to a defendant is presumptively erased from the jury's collective mind when admonitory instructions have been properly given by the court.' " We assume that " 'a properly given admonitory instruction [will be] followed.' " *State v. Pitsch*, 124 Wis. 2d 628, 645 n.8, 369 N.W.2d 711, 720 (1985) (quoted source omitted). Thus, where "a trial court gives the jury a curative instruction, the appellate court may conclude that such instruction erased any possible prejudice, unless the record supports the conclusion that the jury disregarded the trial court's admonition." *State v. Bembenek*, 111 Wis. 2d 617, 634, 331 N.W.2d 616, 625 (Ct. App. 1983) (footnote omitted). The record in this case does not support such a conclusion.

## IV. Television Coverage

In a postconviction motion challenging the verdict for "juror misconduct," Schaller presented the affidavit of one of the jurors indicating that some members of the jury had watched television coverage of the trial and that some of the jurors told her that a brief portion of the station's file-tape footage, taken a year or so earlier at Schaller's initial appearance in court, "showed [him] handcuffed, in jail clothing, with long hair that was uncombed," and that he appeared "really dirty."

The trial court, after viewing a videotape of the coverage at the postconviction motion hearing, described it as follows:

44

> The T.V. broadcast . . . does appear for a period of about 30 seconds [and] the Defendant appears in probably ten or 15 seconds of that videotape. He appears wearing a jail uniform, which for the record consist[s] of . . . dark green pants and dark green shirt. At one time, for about two seconds . . . leg shackles on the Defendant [are visible]. . . . For the record, the only difference I noted was of the clothing. He appeared at trial in shirt and tie, sweater, I believe. His hair is a bit longer than it was at trial.

The court concluded that because the videotape depicted Schaller in a manner much the same as he appeared at trial, it did not constitute the type of "extraneous, prejudicial information" that would warrant proceeding further with Schaller's challenge to the verdict.

Schaller argues on appeal that the juror's exposure to the television report tainted the verdict and thus denied him an impartial jury, entitling him to retrial on the charges.

■■■■

A party attempting to impeach a jury verdict must establish that: (1) the deliberative process was infected by extraneous information; (2) the information was improperly brought to the jury's attention; and (3) the extraneous information was potentially prejudicial. *Castaneda v. Pederson*, 185 Wis. 2d 199, 209, 518 N.W.2d 246, 250 (1994). As to the first, "extraneous information" is information which is neither of record nor within the general knowledge of jurors. *Id.* As to the impropriety of the information, "[i]nformation not on the record is not properly before the jury." *Id.* at 210, 518 N.W.2d at 250. Finally, whether extraneous information is so prejudicial as to require reversal—a question of law which we determine independently on

appeal—turns on whether "there is a reasonable probability that the error would have a prejudicial effect upon a hypothetical average jury." *Id.* at 212, 518 N.W.2d at 251.

The State argues that the trial court correctly determined that the television coverage was not "extraneous," as that term is defined in *Castaneda*, because it is not beyond the scope of the juror's general knowledge. To the contrary, says the State, it is common knowledge that persons appearing in court after being charged with a crime often appear in jail clothing and are sometimes shackled or handcuffed. Assuming, however, that Schaller is correct and that the real issue is whether the information—the video played on the newscast—was prejudicial, we conclude that it was not.

Factors relevant to determining prejudice in such a situation include "the nature of the extraneous information, the circumstances under which the information was brought to the jury's attention, the nature of the state's case, the defense presented at trial, and the connection between the extraneous information and a material issue in the case." *State v. Barthels*, 166 Wis. 2d 876, 894, 480 N.W.2d 814, 822 (Ct. App. 1992), *aff'd on other grounds*, 174 Wis. 2d 173, 495 N.W.2d 341 (1993). Plainly, information—imparted in a matter of seconds on a television newscast and innocently observed by some jurors—that Schaller, after his arrest, was wearing jail clothing, looked unkempt, and very briefly appeared to be wearing handcuffs or shackles, has no connection to the primary issue in his trial for battery, false imprisonment and sexual assault, that is, whether K.S. consented to the sexual and assaultive acts. It shows

46

only that he had been arrested and, initially at least, held in custody on the charges.

This case is not like *State v. Poh*, 116 Wis. 2d 510, 514, 343 N.W.2d 108, 111-12 (1984), where jurors in a vehicular homicide case learned of and discussed the defendant's prior record of accidents and traffic offenses—matters not introduced at trial. Nor is it like *Estelle v. Williams*, 425 U.S. 501 (1976), upon which Schaller places primary reliance, in which the issue was whether "compel[ling] an accused to stand trial before a jury while dressed in identifiable prison clothes" violated the fourteenth amendment. *Id.* at 512. Holding that it did, the Court emphasized that, throughout the trial, the defendant's dress provided a "constant reminder of [his] condition" to the extent that it was "so likely to be a continuing influence through the trial" as to constitute an "unacceptable risk . . . of impermissible factors coming into play" at the trial. *Id.* at 504-05. In contrast, Schaller was dressed in a shirt and tie during his trial; some jurors saw him in jail coveralls and shackles for only a few seconds on a television news broadcast. *Estelle* is a very different case, and we do not see it as materially advancing Schaller's position. Nor do we see any reasonable probability that those few seconds of videotape coverage would have prejudiced an average jury hearing this four-day trial.

*By the Court.*—Judgments and order affirmed.