STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Joseph F. RIZZO, Defendant-Appellant.

Supreme Court

*No. 99–3266–CR. Oral argument October 16, 2001.—Decided February 27, 2002.*

2002 WI 20

(Also reported in 640 N.W.2d 93.)

414

415

416

For the plaintiff-respondent-petitioner the cause was argued by *Jeffrey J. Kassel,* assistant attorney general, with whom on the briefs was *James E. Doyle,* attorney general.

For the defendant-appellant there was a brief by *Franklyn M. Gimbel, Kathryn A. Keppel* and *Gimbel, Reilly, Guerin & Brown,* Milwaukee, and oral argument by *Franklyn M. Gimbel.*

¶ 1. ANN WALSH BRADLEY, J. The petitioner, State of Wisconsin, seeks review of a published court of appeals decision reversing Joseph Rizzo's conviction for multiple counts of sexual assault and remanding his case for a new trial.[1] The State argues that the court of appeals incorrectly concluded that its expert's testi-

---

[1] *See State v. Rizzo,* 2001 WI App 57, 241 Wis. 2d 241, 624 N.W.2d 854 (Ct. App. 2000), reversing and remanding a judgment of the circuit court for Kenosha County, Michael Fisher, Judge. Rizzo was also convicted for intimidating a victim, but that charge is not relevant to the questions before us.

mony constituted *Jensen*[2] evidence, that is, evidence that an alleged victim exhibited behaviors consistent with those commonly observed in sexual assault victims. In addition, the State asserts that the court of appeals erred in determining that a new trial was the appropriate remedy and in concluding that the circuit court improperly denied Rizzo access to the treatment records of the complainant, D.F.

¶ 2. We agree with the court of appeals that the State introduced *Jensen* evidence. However, we conclude that the proper remedy under the facts of this case is a remand for the circuit court to determine whether Rizzo was entitled to a pretrial psychological examination of D.F. under *State v. Maday*, 179 Wis. 2d 346, 507 N.W.2d 365 (Ct. App. 1993). Only if the circuit court determines on remand that the defendant was entitled to a psychological examination is a new trial necessary. In addition, we determine that the court of appeals erred in concluding that the circuit court improperly denied Rizzo access to D.F.'s psychological treatment records. Accordingly, we reverse the decision of the court of appeals and remand to the circuit court. On remand, Rizzo's conviction will stand subject to the court's determination under *Maday*.

I

¶ 3. In June 1997, D.F. reported to police that Rizzo had sexual contact with her on several occasions beginning in 1995 and continuing through April or May 1996. She received treatment from Dr. Linda Marinaccio Pucci, a clinical psychologist, in 1996 after the

---

[2] "*Jensen* evidence" or "*Jensen* testimony" is in reference to this court's decision in *State v. Jensen*, 147 Wis. 2d 240, 432 N.W.2d 913 (1988).

assaults began. The initial treatment lasted about four months, but D.F. returned to Dr. Pucci in the summer of 1997 for additional therapy.

¶ 4. Before trial, Rizzo moved the circuit court to order that D.F. submit to a pretrial psychological examination. He also filed a motion requesting that the circuit court conduct an in camera review of Dr. Pucci's "files, assessments, reports, notes, memoranda, and other records."

¶ 5. In response to Rizzo's motions, the State provided a report prepared by Dr. Pucci, summarizing her knowledge of the case and her treatment of D.F. At a hearing on the motions, the State agreed that the circuit court could conduct an in camera review of D.F.'s treatment records. After conducting the in camera review, the court concluded that Rizzo was not entitled to the treatment records because Dr. Pucci's report fully summarized the contents of the records.

¶ 6. At a subsequent hearing, Rizzo's attorney summarized his position on the requested psychological examination of D.F.:

> [DEFENSE COUNSEL]: As far as the request for independent psychological, our position is with respect to that, that the State is intending to elicit expert testimony from Miss Pucci or Dr. Pucci concerning the issues that would be relevant to an independent fact finder's evaluation of whether a [sic] not a person is a victim of a sexual assault. *Then we believe that the predicate is laid based on the Maday criteria for the Court to order the alleged victim make herself available for independent psychiatric evaluation.*

(Emphasis added.) In response, the State represented that it had initially intended to elicit *Jensen* evidence from Dr. Pucci. However, the State explained, after

reviewing the case law, it decided not to use Dr. Pucci for *Jensen* evidence. The prosecutor stated:

> I will withdraw questions of Dr. Pucci in the area of *Jensen* type of evidence . . . . I am going to represent now, and will not intend on direct examination, subject to the defense opening the door based on cross-examination, elicit expert *Jensen* type testimony from Dr. Pucci . . . . If I do think it is necessary to elicit some *Jensen* testimony, I will call another expert and certainly put the Court and defense on notice with a curriculum vitae attached.

Based on the State's representations, the circuit court concluded that Rizzo was not entitled to the requested psychological examination of D.F.

¶ 7. At trial, Dr. Pucci gave extensive factual testimony with regard to her knowledge and treatment of D.F. Following this testimony, Dr. Pucci responded to the prosecutor's questions as to why "someone would, in this position" not immediately report a sexual assault. She testified that often people are reluctant to report sexual assaults because of threats by the assailant, embarrassment, or a fear that no one will believe them. Rizzo objected to this evidence and renewed his request for D.F.'s treatment records. The court overruled Rizzo's objection to the evidence and denied his request for the records. The jury found Rizzo guilty, and he appealed.

¶ 8. The court of appeals determined that the State had reneged on its pretrial representation that it would not present *Jensen* evidence, thus precluding a "level playing field" under *Maday*. The court's decision in *Maday* requires that given certain prerequisites, a defendant must have the opportunity to show a "compelling need" for the complainant to submit to a pretrial psychological examination. *See* 179 Wis. 2d at 360. The court of appeals also determined that the circuit court

420

should have granted Rizzo access to D.F.'s treatment records. Concluding that Rizzo was denied his rights to due process and a fair trial, the court reversed Rizzo's conviction and remanded his case for a new trial.

## II

¶ 9. This case presents several issues. We must first address a threshold question of whether Dr. Pucci gave *Jensen* testimony as an expert within the scope of *Maday*. Because we conclude that she did after the State represented she would not, we must also determine whether the court of appeals correctly concluded that a new trial was the proper remedy. Finally, we must decide whether the court of appeals correctly determined that Rizzo was improperly denied access to D.F.'s treatment records. In addressing the questions before us, we begin with a discussion of the two cases that form the backdrop for the issues in this case, *Jensen* and *Maday*.

## III

¶ 10. In *State v. Jensen,* 147 Wis. 2d 240, 432 N.W.2d 913 (1988), this court considered the admissibility of expert testimony that a child sexual assault complainant's behavior was consistent with the behaviors of sexual assault victims. The complainant in *Jensen* delayed in reporting an alleged sexual assault to several family members and told others nothing at all. 147 Wis. 2d at 243–44. The first person she told about the alleged assault was her school guidance counselor, who met with her because she had been "acting out" in class, writing a lot of notes to boys, wearing tight clothes, and had pinched a boy's buttocks. *Id.* at 244.

¶ 11. At trial, the counselor testified as an expert on the behavior of sexually abused children. *Jensen,*

147 Wis. 2d at 245. He explained that the complainant's acting out behaviors were consistent with the behavior of children who were victims of sexual abuse. *Id.* at 246–47. The counselor also explained that, in his experience, some children who are sexual assault victims do not tell anyone about it for a long period of time. *Id.* at 247.

¶ 12. The defendant in *Jensen* argued that the circuit court erred in admitting the counselor's comparison of the complainant's acting out behavior with the behaviors of sexual assault victims generally. 147 Wis. 2d at 248–49. In upholding the circuit court's determination, this court concluded that "[b]ecause a complainant's behavior frequently may not conform to commonly held expectations of how a victim reacts to sexual assault, courts admit expert opinion testimony to help juries avoid making decisions based on misconceptions of victim behavior." *Id.* at 252. Some of the complainant's behavior was similar to the normal behavior of adolescents. *Id.* at 246. Nevertheless, the court determined, "an expert opinion is useful for disabusing the jury of common misconceptions about the behavior of sexual assault victims." *Id.* at 251 (citing *State v. Robinson,* 146 Wis. 2d 315, 333, 431 N.W.2d 165 (1988)).[3]

¶ 13. Subsequently, in *Maday,* the court of appeals addressed the question of whether and under

[3] Thus, as this court noted in *State v. Dunlap,* 2002 WI 19, ¶ 33, 250 Wis. 2d 466, 640 N.W.2d 112, also released today, the circuit court may allow an expert witness to give an opinion about the consistency of a complainant's behavior with the behavior of victims of the same type of crime only if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue. *See Jensen,* 147 Wis. 2d at 256.

what circumstances a defendant is entitled to a pretrial psychological examination of a complainant when the State seeks to offer *Jensen* evidence. The State in *Maday* sought to introduce *Jensen* testimony from five experts who had personally interviewed two complainants. *Maday,* 179 Wis. 2d at 350, 355. The circuit court rejected the defendant's request that the complainants submit to psychological examinations. *Id.* at 350.

¶ 14. The court of appeals reversed, reasoning as follows:

> The state has put the behavior of the two victims into issue when it proposed to present, in its case-in-chief, testimony from five experts that the victims' behaviors were consistent with the behaviors of other victims of sexual abuse. Fundamental fairness requires that Maday be given the opportunity to present relevant evidence to counter this evidence from the state. In order to obtain that evidence, Maday must be given the opportunity to discover the psychological condition of the victims.

*Maday,* 179 Wis. 2d at 357. Rejecting the State's argument that a defendant could sufficiently rebut the State's *Jensen* testimony through the responsive mechanisms of cross-examination and testimony by nonexamining experts, the court explained that "[a] defendant who is prevented from presenting testimony from an examining expert when the state is able to present such testimony is deprived of a level playing field." *Id.*

¶ 15. However, recognizing the need to balance the defendant's right to present relevant evidence with the privacy interests of the victim, the court of appeals in *Maday* declined to determine that a defendant is entitled to a pretrial psychological examination in every case where the State intends to introduce *Jensen* evi-

dence. Rather, the court concluded, the defendant must present the circuit court with "evidence that he or she has a compelling need or reason" for the examination. *Maday,* 179 Wis. 2d at 360.

¶ 16. The court identified seven factors for circuit courts to consider in determining whether to grant the defendant's request: (1) the nature of the examination requested and the intrusiveness inherent in that examination; (2) the victim's age; (3) the resulting physical or emotional effects of the examination on the victim; (4) the probative value of the examination to the issue before the court; (5) the remoteness in time of the examination to the alleged criminal act; (6) the evidence already available for the defendant's use; and (7) whether, based on the testimony of the defendant's named expert, a personal interview with the victim is essential before the expert can form an opinion, to a reasonable degree of psychological or psychiatric certainty, that the victim's behaviors are consistent with the behaviors of other victims of sexual abuse. *Maday,* 179 Wis. 2d at 360 (citing *State v. Delaney,* 417 S.E.2d 903, 907 (W. Va. 1992)). The court of appeals remanded for the circuit court to make a determination in light of these factors. *Id.* at 362.

## IV

¶ 17. We begin our analysis of Rizzo's case by determining whether Dr. Pucci gave *Jensen* testimony as an expert within the scope of *Maday.* If Dr. Pucci's testimony was not *Jensen* evidence, then Rizzo would not have been entitled to a determination under *Maday.* In addition, not all State witnesses in sexual assault trials who give *Jensen* evidence will trigger a determination under *Maday.* If Dr. Pucci was not the type of

expert that triggers *Maday*'s protections, then Rizzo would not have been entitled to a *Maday* determination.

■■■

¶ 18. The determination of whether Dr. Pucci gave *Jensen* testimony as an expert within the scope of *Maday* requires that we apply legal standards to the facts of Rizzo's case. Whether a given set of facts meets a particular legal standard is a question of law for our independent review. *State v. Brandt,* 226 Wis. 2d 610, 618, 594 N.W.2d 759 (1999).

A. Dr. Pucci's Testimony as *Jensen* Evidence

¶ 19. The court of appeals concluded that Dr. Pucci's testimony was "tantamount to" *Jensen* evidence. The State asserts that Dr. Pucci's testimony was not *Jensen* evidence because she did not offer an opinion that D.F.'s behavior was "consistent with" the behavior of persons known to be sexual assault victims.

¶ 20. Dr. Pucci's testimony upon direct examination contained a detailed description of her interactions with and treatment of D.F. This included her factual testimony that D.F. had reported a sexual assault to her and that the bulk of D.F.'s 1997 treatment was in response to the sexual assault. As Dr. Pucci's factual testimony concluded, the prosecutor engaged her in the following exchange:

Q Did you ever discuss with [D.F.] in the course[ ] of your treatment why she delayed this report for over a year?

A Yes. We talked about why she finally did report it, and she talked about not wanting to report it when I saw her in 1996 because she and her

family didn't want to press charges; and that changed throughout the course of time, and by 1997 she did want to report it . . . .

Q Dr. Pucci, do you have an opinion as to a reasonable degree of psychological certainty why someone would not report a crime like this under these circumstances?

[DEFENSE COUNSEL]: Objection, your Honor.

THE COURT: It's overruled. The witness may answer.

A Could you repeat the question?

Q Do you have an opinion to a reasonable degree of psychological certainty why someone would, in this position, would not immediately report a crime like this?

A Often people are reluctant to report this kind of crime because of threats the offender or the abuser makes to them about it, either directly telling them not to tell or threatening them if they do tell. Often people are embarrassed. They may be afraid they are not going to be believed. Sometimes they have some positive feelings about the abuser and may not want to get that person into trouble. Those tend to be the most common reasons.

¶ 21. We agree with the court of appeals that Dr. Pucci's testimony made the requisite comparison between D.F.'s behavior and the common behaviors of sexual assault victims. In arguing that it did not, the State is asking this court to hold that Dr. Pucci's

testimony would have been *Jensen* evidence only if she had used magic words such as "D.F.'s behaviors are consistent with that of persons known to be sexual assault victims." We decline to adopt such a mechanistic approach. Instead, we determine that a jury would interpret the prosecutor's questions along with Dr. Pucci's answer to provide the comparison that is the essence of *Jensen* evidence.[4]

¶ 22. The phrasing of the prosecutor's questions and the substance of Dr. Pucci's answer combined to send a clear message to the jury that D.F.'s behaviors were consistent with those of known sexual assault victims. The factual portion of Dr. Pucci's testimony established that she knew D.F. to be a sexual assault victim. The prosecutor then solicited her expert opinion as to what someone would do "under these circumstances" and "in this position." This made it apparent to the jury that a direct comparison was to be drawn between D.F. and others in her circumstances or position, which, according to the factual testimony of Dr. Pucci, were the circumstances or position of a sexual assault victim.[5]

---

[4] The concurrence's conclusions with respect to the applicability of *State v. Maday,* 179 Wis. 2d 346, 507 N.W.2d 365 (Ct. App. 1993), depend upon its distinction between sexual assault victim "reporting" behavior and "acting out" behavior. According to the concurrence, *Jensen* evidence includes only the latter. However, as the concurrence is itself forced to concede, the case law does not recognize this distinction. Concurrence at ¶ 64 & n.9.

[5] For these same reasons, we reject the State's argument that Dr. Pucci's opinion testimony was not "based on" her examination of D.F.

¶ 23. In addition, upon redirect examination, Dr. Pucci gave further testimony that reinforced for the jury that she was equating D.F.'s behaviors with those commonly observed in known sexual assault victims:

Q Dr. Pucci, what was your recollection of the reason [D.F.] did not want to report this in 1996?

A She did not want to press charges against Mr. Rizzo, and she just wanted him to leave them alone and just wanted him to go away and not hurt anyone again.

Q Did she ever discuss with you anything in regard to concerns about whether or not she would be believed? Was that ever discussed that you recall or not?

A She told me that he, that Mr. Rizzo, had told her that if she told anyone she would not be believed.

. . . .

Q 1997. Dr. Pucci, I'm framing that question in terms of your contact with her in 1997. Did she indicate at that time whether that was something she had internalized as a reason she didn't want to report, or was she discussing that with you as one of the many things that was said?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

A My impression is that she had internalized it.

The reasons that Dr. Pucci gave in explaining why D.F. did not report the sexual assault are strikingly similar

to the reasons she gave earlier in her testimony explaining why sexual assault victims generally delay reporting. This similarity would also lead a jury to make the comparison that is the essence of *Jensen* evidence.

## B. Whether Dr. Pucci Was an Expert within the Scope of *Maday*

¶ 24. The State also argues that *Mayday* is inapplicable because it did not "hire" Dr. Pucci as an expert. The State's argument is based primarily on its reading of *State v. David J.K.*, 190 Wis. 2d 726, 528 N.W.2d 434 (Ct. App. 1994). It emphasizes the court of appeals determination in *David J.K.* that "the psychological examination of the complainant authorized in *Maday* is strictly limited to situations in which the prosecution *retains* experts in anticipation of trial in order to present *Jensen* evidence." *Id.* at 735 (emphasis added). According to the State, it did not "retain" Dr. Pucci as an expert; rather, she was D.F.'s treating therapist. Because Dr. Pucci was D.F.'s treating therapist, the State contends, it was merely taking "the facts and the witness as it found them." In essence, the State's position is that it is shielded from *Maday* because it was D.F. who "retained" Dr. Pucci, not the State.

¶ 25. We disagree with the State's characterization of Dr. Pucci as falling outside the intended scope of *Maday*. By reading too much into *David J.K.* and interpreting the concept of "retain" in an overly restrictive manner, the State's position overlooks the core rationale underlying *Maday*.

¶ 26. The core rationale in *Maday* was one of basic fairness. If one side is to introduce testimony by a psychological expert who has examined the victim, the

other side must also be able to request such an oppor-
tunity in order to level the playing field. *Maday,* 179
Wis. 2d at 357. A jury will generally give the opinion of
a psychological expert who has examined a party
greater weight than the opinion of an expert who has
not. The State's position suggests that the key fact in
*Maday* was that its experts were the prototypical "hired
guns." However, in *Maday,* the key fact was that the
psychological experts had personally interviewed and
examined the complainant.

¶ 27. Moreover, the court of appeals in *David J.K.*
did not focus on the distinction between "hired gun"
experts and other experts. Instead, in determining that
*Maday* did not apply, the court in *David J.K.* contrasted
the reason the defendant before it was seeking pretrial
psychological examinations with the reason the defen-
dant in *Maday* sought an examination. *David J.K.,* 190
Wis. 2d at 734. In *Maday,* the defendant sought a
psychological examination in order to rebut the State's
*Jensen* evidence. *See id.* (citing *Maday,* 179 Wis. 2d at
352 & n.3). In *David J.K.,* the defendant sought psy-
chological examinations in order to challenge the two
victims' competency along with their credibility. *Id.* The
court in *David J.K.* concluded that the defendant "failed
to make any showing that the victims lacked mental
competency to testify," and therefore, was not entitled
to examinations. *Id.*

¶ 28. We read the court of appeals statement in
*David J.K.* that a *Maday* determination is limited to
situations where the State "retains experts in anticipa-
tion of trial in order to present *Jensen* evidence" as a
reiteration of its holding in *Maday. Maday* sets forth
the correct standard in detail:

430

> When the state manifests an intent during its case-in-chief to present testimony of one or more experts, *who have personally examined a victim of an alleged sexual assault,* and will testify that the victim's behavior is consistent with the behaviors of other victims of sexual assault, a defendant *may request a psychological examination of the victim.*

179 Wis. 2d at 359–60 (emphasis added).

¶ 29. In *State v. Schaller,* 199 Wis. 2d 23, 544 N.W.2d 247 (Ct. App. 1995), the court of appeals attempted to distinguish between a State psychological expert who has "personally examined" a complainant within the meaning of *Maday* and one who has not. The court explained that *Maday* involved experts who had conducted "psychological examinations" or "psychological interviews" with a complainant. *Id.* at 34. In upholding the circuit court's denial of the defendant's request for a pretrial psychological examination, the court in *Schaller* noted that the State's experts did not testify that they had "examined" the complainant. *Id.* Similarly, in *State v. Mainiero,* 189 Wis. 2d 80, 91, 525 N.W.2d 304 (Ct. App. 1994), the court of appeals referred to a *Maday* expert as one who has "personally interviewed" the complainant.

¶ 30. We agree with the court of appeals' determination in *Schaller* that the fact that a *Jensen* witness has had previous "professional interaction" with the complainant does not by itself trigger *Maday.* Given the facts before us, however, we must clarify the distinction between an expert that may trigger *Maday* and an expert who has only minimal "professional interaction" with a complainant as contemplated in *Schaller.*

¶ 31. Although the court in *Schaller* emphasized that none of the State's experts testified that they had conducted a psychological examination of the complainant, it also noted, somewhat ambiguously, that the State's psychological expert had met with the complainant on one occasion to "evaluat[e] . . . her present functioning and . . . her past experiences." 199 Wis. 2d at 34. While we do not purport to set forth a bright line rule that will prove definitive in every case, the distinction between a psychological expert that triggers *Maday* and one that does not will depend in part on the extent and nature of the contact between the expert and the complainant.

¶ 32. We must not lose sight of the fundamental fairness principle that drives the *Maday* decision. If the State is to introduce *Jensen* evidence through a psychological expert who has become familiar with the complainant through ongoing treatment, or through an intensive interview or examination focused on the alleged sexual assault, the defendant must have the opportunity to show a need to meet that evidence through a psychological expert of its own. As the *Maday* court explained in support of its holding, "a definitive opinion requires an extensive interview plus review of material on the victim's life and behaviors." 179 Wis. 2d at 357.

¶ 33. With these principles in mind, we conclude that it would strain logic and ignore fairness to determine that a psychological expert such as Dr. Pucci does not trigger *Maday*. Dr. Pucci was not just any professional who briefly encountered D.F. after a reported sexual assault. Dr. Pucci was a clinical psychologist who

had an extensive, ongoing relationship with D.F. She interviewed, examined, and diagnosed D.F. Moreover, Dr. Pucci testified that the bulk of her treatment of D.F. in 1997 was directed at the sexual assault. In short, the extent and nature of Dr. Pucci's contacts with D.F. bring her within the ambit of *Maday*.

¶ 34. In addition, we agree with Rizzo and the court of appeals that the State "retained" Dr. Pucci in the sense meant by *David J.K.* Although there is no assertion by Rizzo that Dr. Pucci received a specific witness fee, the State admitted that it "paid three times" for Dr. Pucci's flights, hotel, rental cars, and meals in order to bring her from Tennessee, where she had relocated since treating D.F.

¶ 35. More to the point, however, we determine that even if the State had not compensated or reimbursed Dr. Pucci, she would still have been a *Maday* expert. A determination of whether the State "retains" an expert for purposes of *Maday* cannot stand or fall on whether or how it has compensated its expert. Such a determination would thwart the fundamental principle underlying *Maday* and would allow the State to subvert *Maday* by, for example, obtaining an expert willing to volunteer her time. For the same reasons, we conclude that an expert's status as the complainant's treating therapist does not preclude that expert from being "retained" by the State for purposes of *Maday*.

¶ 36. In sum, given the nature of Dr. Pucci's interactions with D.F., she was an expert within the scope of *Maday*. Her testimony contained *Jensen* evidence because she made a comparison between D.F.'s behavior and the behaviors of sexual assault victims generally.

433

¶ 37. It is important to emphasize that our decision does not tie the State's hands in presenting expert witnesses in sexual assault trials. It does not require that a defendant receive a determination under *Maday* whenever the State calls a complainant's treating psychologist as a witness. Here, the State would have been free to elicit factual and opinion testimony from Dr. Pucci without triggering *Maday* if it had called a different witness in order to introduce *Jensen* evidence. Indeed, before trial, this is precisely the course the State represented that it would follow if it determined that *Jensen* evidence was necessary.

¶ 38. In addition, *Maday*'s own balancing test prevents a defendant from receiving a pretrial psychological examination in every case where the State wishes to call a psychological expert who has examined the victim to give *Jensen* testimony. A conclusion that a defendant is entitled to a *Maday* determination is not equivalent to a conclusion that the defendant is entitled to a psychological examination. For that, the defendant must show a "compelling need" for the examination under *Maday*.

¶ 39. We are mindful of the need to protect the privacy interests of sexual assault victims and to ensure that they are not re-victimized by the intrusiveness of a defense psychological examination unless necessary to preserve the competing constitutional rights of the defendant. Sexual assault complainants should not be caught needlessly between their privacy interests and the vigorous prosecution of the alleged perpetrators. However, as we have indicated, it is only when the State seeks to admit *Jensen* evidence through a *Maday* expert that a complainant will face the possibility of a defense

434

psychological examination. In many cases, the experts involved will not fall within the confines of *Maday*.

¶ 40. Likewise, we stress that the very purpose of the *Maday* test is to account for the privacy interests of the victim in the face of the defendant's competing constitutional rights. *See* 179 Wis. 2d at 359–60. The factors under *Maday* represent substantial hurdles that a defendant seeking a psychological examination must clear. They ensure that the privacy interests of victims are properly protected, and they preclude defense psychological examinations that amount to nothing more than fishing expeditions. These factors, together with the obstacles that the defendant faces in asserting that the State's witness is an expert within the meaning of *Maday,* constitute a carefully crafted system of procedural and substantive safeguards that ensure the protection of the victim's privacy interests.[6]

V

¶ 41. Because the State introduced *Jensen* evidence through an expert within the scope of *Maday* after Rizzo was denied a pretrial psychological examination based on the State's representation that this evidence would not be offered, we must determine the

---

[6] Thus, the concurrence paints the implications of our decision with too broad a brush. The combined effect of the procedural and substantive safeguards we discuss is that a sexual assault complainant will be subject to a psychological examination only when (1) the State insists on using a *Maday* expert to present *Jensen* evidence *and* (2) the defendant prevails under the seven factors of *Maday,* which specifically recognize and account for the intrusive nature of the examination.

remedy due Rizzo. The court of appeals concluded that Rizzo was deprived of his rights to due process and a fair trial and, accordingly, that the appropriate remedy was a new trial. Whether an individual is denied a constitutional right is a question of law for this court's independent review. *State v. Cummings,* 199 Wis. 2d 721, 748, 546 N.W.2d 406 (1996). Similarly, the determination of the proper remedy in the face of a constitutional violation is a question for our independent review. *See State v. Anderson,* 165 Wis. 2d 441, 447, 477 N.W.2d 277 (1991).

¶ 42. The State suggests two possible remedies. First, the State asserts that this court can and should apply the factors in *Maday* and determine as a matter of law that Rizzo failed to show he was entitled to a pretrial psychological examination. In the alternative, the State asks that we remand for the circuit court to apply the *Maday* factors. In addition, the State contends, even if the circuit court determines Rizzo was entitled to a psychological examination under *Maday,* the disallowance of the examination is subject to a harmless error analysis. We agree with the State that a remand for a *Maday* determination is in order, but we reject the State's assertion that Rizzo's case is subject to a harmless error analysis.

¶ 43. Normally, the determination of whether the defendant has presented evidence demonstrating a compelling need for a pretrial psychological examination is a matter for the circuit court's discretionary determination. *See Schaller,* 199 Wis. 2d at 33–34. Here, the court never exercised its discretion by applying *Maday* because the State represented that it would not offer *Jensen* evidence through Dr. Pucci. Consequently, Rizzo did not have an adequate opportunity to develop

arguments or evidence to show he had a compelling need for a psychological examination under *Maday*. Accordingly, we do not attempt to apply *Maday* on the present record in order to determine whether Rizzo failed to make the required showing.

¶ 44. At the same time, however, neither Rizzo nor the court of appeals has adequately explained why a new trial is necessarily the remedy. When the State introduced its *Jensen* evidence through Dr. Pucci, it was Rizzo's right to a pretrial determination under *Maday* that was violated. Only if Rizzo should have been granted his request for a pretrial psychological examination did the State's introduction of *Jensen* evidence violate his rights to due process and a fair trial. Because, as we have already noted, the circuit court never had the opportunity to exercise its discretion in applying the *Maday* factors, we do not know whether Rizzo would have been able to survive a determination under *Maday*. Therefore, we remand for the circuit court to apply *Maday*.

¶ 45. We reject, however, the State's invitation to apply a harmless error analysis. The test for harmless error is whether there is a reasonable possibility that the error contributed to the conviction. *State v. Jackson,* 216 Wis. 2d 646, 668, 575 N.W.2d 475 (1998); *State v. Dyess,* 124 Wis. 2d 525, 543, 370 N.W.2d 222 (1985). A reasonable possibility is a possibility sufficient to undermine our confidence in the outcome. *State v. Grant,* 139 Wis. 2d 45, 51, 406 N.W.2d 744 (1987).

¶ 46. The State explains that the harmless error analysis would proceed as follows: "if Rizzo's expert, after examining D.F., does not offer an opinion that, had it been admitted at trial, would have affected the result

of the trial, then any error in not allowing the examination and thereby excluding the expert's testimony was harmless." We determine that the harmless error test need not be applied here as the State asserts.

¶ 47. Although the test for "compelling need" under *Maday* is undoubtedly different than the test for harmless error, a determination that the psychological examination was necessary to level the playing field seems inconsistent with a determination that the absence of such an examination was harmless error. A decision by the circuit court that a defendant is entitled to a pretrial psychological examination of the victim is tantamount to a determination that fundamental fairness requires that the defendant be given the opportunity to present relevant evidence to counter the State's *Jensen* evidence. *Maday,* 179 Wis. 2d at 357. Accordingly, we do not apply a harmless error analysis. Instead, we direct that if the circuit court determines that Rizzo was entitled to a pretrial psychological examination, then he should receive a new trial.

## VI

¶ 48. Finally, we must determine whether Rizzo was improperly denied access to D.F.'s treatment records. Before trial, the circuit court conducted an in camera review of the records in accordance with *State v. Shiffra,* 175 Wis. 2d 600, 499 N.W.2d 719 (Ct. App. 1993). The State agreed that Rizzo had made the preliminary showing of materiality necessary for an in camera review. The court compared the records to Dr. Pucci's summary report and concluded that Rizzo was not entitled to the records:

> Well, the Court has had the opportunity to review the psychological file, and what I did first was go over

the summary and see what the summary said; and then I began to page through the doctor's file . . . . Well, very frankly, if you go through this entire file and you go through it essentially line by line, you won't find anything different than what you find in her summary. . . . [T]here is really no information that is contained in this file that you don't know about already that would be exculpatory in any way or even lead to anything that is exculpatory . . . .

Subsequently at trial, after Dr. Pucci gave her *Jensen* testimony, Rizzo again raised the issue of access to the treatment records, arguing that he needed them to effectively cross-examine her. The circuit court denied Rizzo's request, concluding "[t]here has been no showing that would satisfy the Court that would be appropriate."

■■■

¶ 49. We review under the clearly erroneous standard the findings of fact made by the circuit court. *Shiffra,* 175 Wis. 2d at 605. However, we independently apply any constitutional principles involved to the facts as found. *Mainiero,* 189 Wis. 2d at 88.

¶ 50. Rizzo does not contend that the circuit court made clearly erroneous fact findings. Instead, he asserts that Dr. Pucci's testimony "opened the door" to cross-examination as to the source of her additional, unanticipated testimony. He relies on the court of appeals' conclusion that Dr. Pucci's *Jensen* testimony went "beyond the scope of her summary report." In addition, he argues that the records were essential to impeach her and attack her credibility. He concludes that without the records, he was deprived of his constitutional right to present a defense. We disagree.

¶ 51. Before trial, the circuit court found that there was nothing relevant in D.F.'s treatment records

that was not also in Dr. Pucci's summary report. Although Dr. Pucci ventured beyond the scope of her summary report at trial in that the report did not say she would give *Jensen* testimony, it does not automatically follow that Rizzo was entitled to D.F.'s treatment records. Because Dr. Pucci's factual testimony was anticipated, her *Jensen* testimony did not change the scope of relevant information in D.F.'s treatment records. The argument that Rizzo could somehow impeach Dr. Pucci's expert knowledge of the common behaviors of sexual assault victims by accessing the treatment records of one of her patients is not persuasive.

¶ 52. Rizzo also argues that he needed D.F.'s treatment records to cross-examine Dr. Pucci because it was unclear whether a statement in quotation marks in Dr. Pucci's summary report was attributable to Dr. Pucci or to D.F.'s parents. The statement said that D.F. was "lying, and manipulative, and good at diverting attention." Dr. Pucci testified that these were not the parents' exact words, but rather her interpretation of what they had said. She explained that she placed them in quotation marks to signify that she was quoting another source, an intake form.

¶ 53. Rizzo's position appears to be that he was entitled to cross-examine Dr. Pucci using the treatment records because if the records would have revealed the source of the quote as D.F.'s parents, this would have undermined Dr. Pucci's credibility. We do not adopt Rizzo's position because it would eviscerate the procedure for in camera review set forth in *Shiffra,* which protects a victim's confidential records. In effect, Rizzo's position would provide that the defendant must receive full access to the victim's treatment records in every

case in order to effectively cross-examine an expert who treated the victim. That is in stark contrast to the in camera procedure under *Shiffra,* which specifically balanced the victim's interest in confidentiality against the constitutional rights of the defendant. *See* 175 Wis. 2d at 609–10.

■■■

¶ 54. In short, Dr. Pucci's *Jensen* testimony did not undermine the basis for the circuit court's original decision denying Rizzo access to D.F's treatment records. Furthermore, under *Shiffra,* a defendant is not entitled to the records of a victim's treating therapist simply to impeach the therapist's credibility. Therefore, we determine that when the circuit court denied Rizzo's renewed request for the records, it correctly reaffirmed its pretrial decision.[7]

## VII

¶ 55. In sum, we conclude that the State introduced *Jensen* testimony through an expert within the scope of *Maday* after representing to the circuit court that it would not do so. Consequently, Rizzo was deprived of his right to a pretrial determination under *Maday.* We determine that the proper remedy under the facts of this case is a remand for the circuit court to determine whether Rizzo was entitled to a pretrial psychological examination of D.F. Only if the court determines on remand that Rizzo was entitled to a psychological examination is a new trial necessary. In

---

[7] On remand, if Rizzo receives a new trial because the circuit court determines that he was entitled to a psychological examination under *Maday,* the court may or may not need to revisit the treatment records issue, depending on how the parties' strategies unfold.

addition, we determine that the court of appeals erred in concluding that Rizzo was improperly denied access to D.F.'s treatment records. Accordingly, we reverse the court of appeals and remand for the circuit court to make a determination under *Maday*.

*By the Court.*—The decision of the court of appeals is reversed and the cause remanded to the circuit court.

¶ 56. DIANE S. SYKES, J. *(concurring)*. The central question in this case concerns the scope of *Jensen*[1] for purposes of *Maday*.[2] I disagree with the majority's conclusion that the expert testimony at issue in this case is *Jensen* evidence. *Jensen* must be read in the context of its facts, in light of the type of evidence actually in dispute in that case.[3] Alternatively, if the expert testimony at issue in this case comes under the umbrella of *Jensen*, I would conclude that this particular type of *Jensen* evidence does not trigger a *Maday* request for a defense psychological examination of the victim.

¶ 57. *Jensen* involved the sexual assault of an 11–year-old girl by her stepfather. As in many sexual assault cases, especially those involving children, the victim did not report the abuse immediately. She ultimately disclosed it to her school guidance counselor, who met with her because of concerns about changes in her behavior, particularly a marked onset of sexually precocious "acting out" behavior. *State v. Jensen,* 147 Wis. 2d 240, 244–45, 432 N.W.2d 913 (1988).

¶ 58. The State presented the counselor as a fact and expert witness at trial, questioning him briefly

---

[1] *State v. Jensen*, 147 Wis. 2d 240, 432 N.W.2d 913 (1988).

[2] *State v. Maday*, 179 Wis. 2d 346, 507 N.W.2d 365 (Ct. App. 1993).

[3] *See Jensen*, 147 Wis. 2d at 248–49.

about the phenomenon of delayed reporting in sexual assault cases, and in more detail about the significance of the victim's post-assault "acting out" behavior and its consistency with the behavior of sexual assault victims generally. On appeal, however, and significant to the application of *Jensen* after *Maday,* the defendant challenged only the latter category of the counselor's opinion testimony, as the following passage of the opinion makes clear:

> On review the defendant challenges the admissibility of only one part of Mr. Bosman's [the counselor's] testimony, namely, Mr. Bosman's comparison of L.J.'s [the victim's] "acting out" behavior with the behavior of child sexual abuse victims. The defendant objects only to the circuit court's decision to admit the question, "In your opinion . . . are the kinds of acting out behavior that the teachers described to you that they were seeing in L— consistent with children who were victims of sexual abuse?" and the witness's answer, "Yes."

*Jensen,* 147 Wis. 2d at 248–49.

¶ 59. Jensen argued that this testimony amounted to an expert opinion that the victim was telling the truth, impermissible under *State v. Haseltine,* 120 Wis. 2d 92, 352 N.W.2d 673 (Ct. App. 1984). *Jensen,* 147 Wis. 2d at 249. This court disagreed, concluding that an expert's opinion about the consistency of a sexual assault victim's behavior with that of other sexual assault victims is admissible if it helps the factfinder understand the evidence or decide a fact in issue. *Id.* at 256–57. The court emphasized, however, that the expert testimony may not be expressed as an opinion about the credibility of the victim, because Wisconsin law prohibits a witness from testifying " 'that

443

another mentally and physically competent witness is telling the truth.' " *Id.* at 249 (quoting *Haseltine,* 120 Wis. 2d at 96).

¶ 60. The court then concluded that the guidance counselor's testimony about the significance of the victim's post-assault "acting out" behavior did not constitute an impermissible opinion about the victim's credibility but merely explained how the counselor's concerns precipitated his meeting with the victim during which she disclosed the abuse. *Jensen,* 147 Wis. 2d at 249. The court further concluded that the opinion evidence was admissible to rebut the defense theory that the victim had fabricated the assault. *Id.*

¶ 61. Understood in context, therefore, *Jensen* evidence is expert testimony about the consistency of a sexual assault victim's post-assault reactive changes in behavior—conduct separate from the facts of the assault and the manner in which the victim reported it—with that of sexual assault victims generally.[4] Under *State v. Maday,* 179 Wis. 2d 346, 507 N.W.2d 365 (Ct. App. 1993),[5] when the State intends to introduce this type of psychological opinion testimony through an expert who has conducted a personal examination of the victim, the defense may request a court-ordered psychological examination of the victim by an expert of the defendant's choosing. As the majority notes, *Maday* requests are evaluated according to a seven-factor analysis that balances the potentially traumatic effect

---

[4] *Jensen* did not involve "rape trauma syndrome" testimony, that is, opinion evidence that the victim manifested psychological symptoms shared by all rape victims, offered to prove that the victim was in fact sexually assaulted. *Jensen,* 147 Wis. 2d at 245–46 n.1.

[5] *Maday,* 179 Wis. 2d at 359–60.

444

of a court-ordered clinical psychological examination on the victim against the defendant's need for the evidence.[6]

¶ 62. *Maday*'s "leveling-of-the-playing field"[7] approach makes sense if *Jensen* evidence is understood as the type of evidence actually at issue in *Jensen,* that is, opinion testimony about the diagnostic significance of a victim's post-assault change in behavior. This type of evidence puts the victim's post-assault psychological condition at issue where it otherwise would not be. When the state seeks to introduce such evidence through a *Maday*-type expert—one who has conducted a personal examination of the victim for purposes of evaluating his or her post-assault change in behavior for consistency with that of other sexual assault victims—the state puts the defendant at an evidentiary disadvantage.[8] In this situation, the notion that the defendant should be entitled to ask for a court-ordered psychological examination of the victim is understandable on fundamental fairness grounds.

¶ 63. But the threat of an inherently intrusive court-ordered psychological examination of a sexual assault victim should *not* be present where, as here, the State presents garden-variety, expert testimony about the common phenomenon of delayed reporting in sexual assault cases, even if that testimony comes in through a *Maday*-type expert who has personally examined the victim, and even if the expert draws a *Jensen*-type consistency comparison. This sort of expert testimony does not make the victim's psychological condition an issue, and therefore does not put the

[6] *Maday*, 179 Wis. 2d at 360–61; majority op. at ¶ 16.

[7] *Maday*, 179 Wis. 2d at 357.

[8] *Maday*, 179 Wis. 2d at 357.

defense at an evidentiary disadvantage without its own psychological examination of the victim.

¶ 64. I recognize that the court's holding in *Jensen* is expressed in broad terms, extending its theory beyond its factual context.[9] But applying the *Jensen* label to *all* expert testimony drawing consistency comparisons about victim behavior, regardless of its type, is conceptually problematic, and, more importantly, unnecessarily puts sexual assault victims at risk of being ordered to undergo the ordeal of an unwanted psychological examination under *Maday*.

¶ 65. Of course, a victim may refuse to submit to a court-ordered psychological examination, but then, according to *Maday*, the state must forego the use of the examining expert's testimony.[10] This puts the victim in something of an untenable position if he or she wants the prosecution to put on its best case for conviction, as crime victims usually do.

---

[9] In a separate case also announced today, *State v. Dunlap*, 2002 WI 19, — Wis. 2d —, 640 N.W.2d 112, this court concludes that expert testimony comparing a child sexual assault victim's reporting behavior to the common reporting behavior of child sexual assault victims—*e.g.*, delayed and progressive disclosure, confusion about the timing and physical details of the assault—is admissible under *Jensen*. Other cases have also applied *Jensen* broadly, without recognizing any distinction in the type of expert testimony at issue. *See State v. Huntington*, 216 Wis. 2d 671, 697–98, 575 N.W.2d 268 (1998); *State v. DeSantis*, 155 Wis. 2d 774, 794–95, 456 N.W.2d 600 (1990); *State v. Vinson*, 183 Wis. 2d 297, 309–12, 515 N.W.2d 314 (Ct. App. 1994).

[10] *Maday*, 179 Wis. 2d 361–62.

¶ 66. It is important to note that *Jensen* relied heavily on certain explanatory language in *Haseltine*,[11] as well as this court's earlier opinion in *State v. Robinson*, 146 Wis. 2d 315, 431 N.W.2d 165 (1988).[12] Both *Haseltine* and *Robinson* held that expert testimony explaining a sexual assault victim's reporting behavior in the context of common reporting behaviors of sexual assault victims generally is admissible to rebut a defense suggestion that such behavior is inconsistent with a claim of having been sexually assaulted.[13]

> For example, an incest victim may not immediately report the incest, or may recant accusations of incest. Jurors might reasonably regard such behavior as an indication that the victim was not telling the truth. An expert could explain that such behavior is common among incest victims as a result of guilt, confusion, and a reluctance to accuse a parent.

*Haseltine*, 120 Wis. 2d at 97. This kind of expert testimony (in *Robinson* it was an explanation of the victim's emotional "flatness" upon reporting the assault) "serves a particularly useful role by disabusing the jury of some widely held misconceptions about sexual assault victims." *Robinson*, 146 Wis. 2d at 335.

¶ 67. Considered against the backdrop of *Haseltine* and *Robinson*, therefore, the import of *Jensen* was twofold: 1) it legitimized the "consistency comparison" form of expert testimony (*i.e.,* opinion testimony that the victim's behavior is "consistent with" that of other

---

[11] *State v. Haseltine*, 120 Wis. 2d 92, 97, 352 N.W.2d 673 (Ct. App. 1984).

[12] *State v. Robinson*, 146 Wis. 2d 315, 431 N.W.2d 165 (1988).

[13] *Robinson*, 146 Wis. 2d at 334–35; *Haseltine*, 120 Wis. 2d at 96–97.

sexual assault victims); and 2) it extended the *Robinson* doctrine of admissibility, derived from the language in *Haseltine,* to expert explanations of other types of victim reactive behavior, specifically, post-assault changes in behavior separate and distinct from the manner in which the victim reports the assault. *Jensen* thus contained important developments in the law of evidence regarding both the form and the substance or type of permissible expert testimony in this area.

¶ 68. The difference in type (rather than form) of expert testimony authorized in *Jensen* from that previously authorized in *Robinson* and referenced in *Haseltine* becomes important for purposes of *Maday.*[14] *Robinson*-type expert testimony about common victim reporting behavior, stated in the form of a *Jensen*-style consistency comparison has become relatively routine in sexual assault cases. *Jensen*-type expert testimony about the psychological significance of post-assault changes in a victim's behavior is more unusual, and

---

[14] The majority focuses only on the form of the expert testimony to determine whether it fits within the ambit of *Jensen* for purposes of *Maday.* I agree with the majority's conclusion that Dr. Pucci, the State's expert, essentially expressed her opinion in the form of a *Jensen*-style consistency comparison even though she did not use the phrase "consistent with" or similar "magic words" in stating her opinion. In authorizing the admissibility of the consistency comparison form of opinion testimony in this area, *Jensen* suggested that there is no "legally significant" distinction between an explicit consistency comparison and expert testimony that is merely descriptive of the victim's behavior as against that of other sexual assault victims. *Jensen,* 147 Wis. 2d at 253. But the majority here does not look beyond the form of the expert testimony to consider its substance or type, which is important to the determination of whether the evidence fits within *Jensen* for purposes of *Maday.*

tends to make the victim's psychological condition more central to the case. It also comes closer to being substantive (albeit circumstantial) evidence that the crime occurred, rather than merely rehabilitative evidence rebutting a defense attack on inconsistencies in the victim's manner of reporting the assault.

¶ 69. These distinctions may be difficult to draw, but they make an important difference under *Maday*. If the State seeks to buttress its case by emphasizing the victim's post-assault psychological condition through expert testimony about victim behavior that would otherwise not be part of the case, a court-ordered psychological examination of the victim may be justified under *Maday*.

¶ 70. But there is no justification for subjecting a sexual assault victim to the invasiveness of such an examination where the expert testimony concerns only a comparison of the way in which the victim reported the crime—which is an essential and unavoidable part of every sexual assault case—to the reporting behavior of sexual assault victims generally. In other words, there is no justification for including comparison testimony about victim reporting behavior under the umbrella of *Jensen* for purposes of *Maday*.

¶ 71. If indeed *all* expert testimony drawing *any* consistency comparison between a victim's behavior and that of other sexual assault victims constitutes *Jensen* evidence, then *Maday* requests should be limited to those cases in which the proffered *Jensen* evidence puts the victim's post-assault psychological condition at issue in a significant way. Only then does fundamental fairness require that the defense be given the same access to a clinical examination of the victim as the state, and only if the court, after analyzing the

case under the seven-factor test in *Maday,* concludes that the defendant's interests outweigh the victim's.

¶ 72. The seven-factor *Maday* analysis, therefore, should be preceded by an evaluation of the type of. expert testimony the State seeks to introduce, the form the expert opinion will take, and the purposes for which it is offered. If the proposed expert testimony concerns the common reporting behaviors of sexual assault victims and is offered as educative evidence to disabuse the jury of misconceptions about victims or to rebut a defense attack on these issues, then *Maday* does not come into play.

¶ 73. This is (or should be) so even if the testimony comes from a *Maday*-type examining expert in the form of a *Jensen*-style consistency comparison, because this sort of testimony simply cannot be said to place the victim's psychological condition in issue, and, therefore, does not give rise to any of *Maday*'s fundamental fairness concerns. Under these circumstances, the victim's privacy interests will always outweigh the defendant's discovery interests.

¶ 74. If, on the other hand, the proposed testimony is an opinion by an examining expert about the psychological significance of a victim's post-assault change in behavior, is stated in the form of a consistency comparison, and is offered in whole or in part as circumstantial evidence that the alleged assault occurred, then *Maday* is triggered and the seven-factor analysis should be undertaken. Under these circumstances, the *Maday* concerns about a "level playing field" may indeed be present.

¶ 75. The disputed evidence in this case consists of the State's expert's explanation of the 14–year-old victim's delay in reporting the defendant's sexual abuse in the context of the phenomenon of delayed reporting

in sexual assault cases generally. This evidence is not similar to the type of expert testimony at issue in *Jensen* and did not put the victim's post-assault psychological condition at issue in any significant way, so the fundamental fairness considerations of *Maday* are plainly not present.[15]

¶ 76. Accordingly, while I concur with the majority's decision to reverse the court of appeals, I disagree with its analysis of the scope of *Jensen* for purposes of *Maday*. I would hold that the disputed expert testimony in this case was not *Jensen* evidence. Alternatively, if it was *Jensen* evidence, then it was not the type of *Jensen* evidence that triggers a *Maday* request for a defense psychological examination of the victim. The admission of the evidence in the absence of a *Maday* determination was not error. I would reverse the court of appeals without remanding for application of *Maday*.

---

[15] I agree, however, with the majority's conclusion that Dr. Pucci was an expert who personally examined the victim within the meaning of *Maday*. The fact that she was the victim's treating psychologist retained by the victim's family rather than a litigation expert retained by the State is not relevant to the fundamental fairness analysis under *Maday*.