STATE of Wisconsin, Plaintiff-Respondent,

v.

Joseph F. RIZZO, Defendant-Appellant.†

Court of Appeals

*No. 03–0163–CR. Submitted on briefs September 10, 2003.—
Decided October 15, 2003.*

2003 WI App 236

(Also reported in 672 N.W.2d 162.)

† Petition to review denied 12-16-03.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Franklyn M. Gimbel, Kathryn A. Keppel* and *Raymond M. Dall'Osto* of *Gimbel, Reilly, Guerin & Brown* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *Jeffrey J. Kassel*, assistant attorney general.

Before Brown, Nettesheim and Snyder, JJ.

¶ 1. BROWN, J.   Joseph F. Rizzo appeals from a judgment and an order entered following a remand by our supreme court for a determination as to whether he is entitled to a psychological examination of the sexual

assault victim pursuant to *State v. Maday*, 179 Wis. 2d 346, 507 N.W. 2d 365 (Ct. App. 1993). *See State v. Rizzo*, 2002 WI 20, ¶ 2, 250 Wis. 2d 407, 640 N.W.2d 93 (*Rizzo I*). On remand, the trial court denied Rizzo's motion for a psychological examination and a new trial, ruling that the *Jensen*[1] testimony offered in this case was limited to the victim's delayed reporting, and Rizzo's expert established that he could offer an opinion concerning the delayed reporting aspects of the case without conducting a psychological examination of the victim. On appeal, Rizzo argues that the State's *Jensen* testimony covered all of the victim's postassaultive behavior, not just her delay in reporting, and that his expert's statements confirm that a personal interview with D.F. was essential for him to form an opinion as to whether her behavior was consistent with the behaviors of victims of sexual abuse. We conclude that the State's *Jensen* evidence was confined to delayed reporting. We also hold that Rizzo failed to demonstrate that a psychological examination of the victim is necessary for his expert to develop opinion testimony that would counter the State's *Jensen* evidence concerning delayed reporting. We affirm.

¶ 2.     All of the charges in this case involved sexual contact with the same fourteen-year-old girl, D.F. In late 1995, D.F.'s parents began noticing that D.F. was exhibiting problems, including a lack of communication, bad grades, lying, wearing inappropriate clothes and make-up, failing to explain her whereabouts and her relationships with kids who associated with gang members. They contacted Rizzo, their neighbor, who

---

[1] *State v. Jensen*, 147 Wis. 2d 240, 242, 432 N.W.2d 913 (1988) (holding that expert testimony that a child sexual assault complainant's behavior was consistent with the common behaviors of known sexual assault victims is admissible).

had helped them with marital problems in the past and had become a good friend and family member. D.F.'s parents believed that Rizzo was able to straighten out troubled people and that he had been trained by Chinese monks in both martial arts and "healing." Rizzo went to D.F.'s home on December 8, 1995, and he and D.F.'s parents discussed what he would do to help D.F. They agreed on a "hands over body" healing technique that would not involve touching D.F. Rizzo indicated that he saw D.F. approximately five times between December 1995 and May 1996 and spoke with her often by telephone. D.F.'s mother, however, stated that Rizzo would come to their home "almost every night" for healing sessions with D.F.

¶ 3. In May 1996, D.F. told her parents that Rizzo had been touching her inappropriately since December 1995. D.F.'s mother called Rizzo the next day and told him that D.F. would no longer be counseling with him. D.F. and her parents did not report Rizzo's alleged conduct with D.F. until June 1997. Rizzo denied ever touching D.F. inappropriately. Subsequently, the State charged Rizzo with three counts of second-degree sexual assault of a child in violation of WIS. STAT. § 948.02(2) (2001–02);[2] one count of repeated acts of sexual assault to the same child in violation of WIS. STAT. §§ 948.02(2) and 948.025(1); and one count of intimidating a witness, party to a crime, in violation of WIS. STAT. §§ 939.05, 940.44 and 940.45. Following a trial, a jury found Rizzo guilty on all counts and he appealed.

---

[2] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

¶ 4. In the previous appeal, the primary issue was whether the State's expert, Dr. Linda Marinaccio Pucci, a clinical psychologist who treated D.F. in 1996 and 1997, gave *Jensen* testimony. We held that Dr. Pucci's testimony constituted *Jensen* testimony and that Rizzo was entitled to a new trial because he had "lost his right to obtain access to relevant evidence necessary to be heard in his own defense." *State v. Rizzo*, 2001 WI App 57, ¶¶ 7, 14, 241 Wis. 2d 241, 624 N.W. 2d 854. Our supreme court affirmed our ruling that the State had introduced *Jensen* testimony, but reversed our order for a new trial. *Rizzo I*, 250 Wis. 2d 407, ¶ 2. The court reasoned that it was Rizzo's "right to a pretrial determination under *Maday* that was violated" and hence Rizzo's right to a fair trial was violated only if his request for a pretrial psychological examination should have been granted. *Rizzo I*, 250 Wis. 2d 407, ¶ 44. Accordingly, the supreme court remanded the case so that the trial court could determine whether Rizzo was entitled, pursuant to *Maday*, to a pretrial examination of D.F. *Rizzo I*, 250 Wis. 2d at 407, ¶ 55.

¶ 5. Following the remand from the supreme court, Rizzo filed a motion seeking a determination that he was entitled to a psychological examination of D.F. and, therefore, to a new trial. In support of the motion, Rizzo filed an affidavit from Dr. Marc Ackerman, a psychologist whom Rizzo had retained. The trial court held an evidentiary hearing on the motion in September 2002, at which Dr. Ackerman provided extensive testimony. The court subsequently issued a written decision and order denying the motion, concluding that it was clear that Dr. Pucci's *Jensen* testimony was confined to delayed reporting and that the hearing established that "Dr. Ackerman could without conducting a psychological examination of [D.F.] offer an opin-

907

ion concerning why someone would not immediately report such a crime just as Dr. Pucci did." Accordingly, the court held, "'[t]here is no compelling need to examine [D.F.] to give that opinion in regard to people who are alleged to be victims of sexual abuse or sexual assault." Rizzo appeals.

¶ 6.    We begin by addressing Rizzo's claim that Dr. Pucci's *Jensen* testimony was not confined to D.F.'s reporting behavior. Rizzo argues that the trial court's conclusion that the State's *Jensen* evidence did not embrace a more general comparison between D.F.'s behaviors and the common behaviors of sexual assault victims is a mischaracterization of Dr. Pucci's testimony. To accurately address Rizzo's argument, we believe it is important that we first provide a detailed description of the content of Dr. Pucci's testimony.

¶ 7.    Dr. Pucci first gave extensive factual testimony with regard to her knowledge and treatment of D.F. Dr. Pucci testified that her initial treatment of D.F. spanned four to five months, from April until August 1996, and that D.F. returned to her in 1997 for additional therapy.

¶ 8.    Dr. Pucci testified that in April 1996, before D.F. had made her accusations against Rizzo, D.F. and her parents met with Dr. Pucci. D.F.'s parents told Pucci that they were concerned about problems with D.F.— her lying, her behavior problems, her threatening to jump out of a window or hurt herself, her falling grades, her spending time with kids associated with gangs, her leaving home without permission and her running away from home. In speaking with D.F., Dr. Pucci learned that D.F. had been abusing inhalants, including nail polish and whiteout, and had tried beer, wine and other alcoholic beverages. Dr. Pucci testified that her treatment goals for D.F. at that point were to stop the

inhalants, develop a support system outside of gangs, build a positive self-concept and build trust within the family. Dr. Pucci stated that she noticed progress in these four areas immediately. Dr. Pucci testified that at the fifth session, D.F. told her that an adult had until recently been "messing with her," but that she would not tell her who it was or what had happened. Dr. Pucci testified that she did not press D.F. for more details and that D.F. did not further disclose the details of the person's identity in the 1996 sessions.

¶ 9.   Dr. Pucci testified that the family returned to see her in 1997. At that time, both D.F. and her parents told her that she had been molested by a family friend, who was a neighbor. The parents told Dr. Pucci they were concerned about how D.F. was doing. She was expressing a lot of fear and anxiety and she was not eating or sleeping. Dr. Pucci testified that she did not make any connection as to why D.F. was coming to see her in 1997 and her disclosure about the sexual contact in 1996. Dr. Pucci then stated that she considered the problems she was treating D.F. for in 1997 to be "symptoms."

¶ 10.   Dr. Pucci testified that over the course of D.F.'s treatment in 1997, D.F. told her Rizzo had molested her and provided more details as to the sexual abuse. D.F. told Dr. Pucci that in the context of providing his counseling to her in "the way monks do," he would touch her in an effort to adjust her aura. D.F. told Dr. Pucci that Rizzo messed with her chest, squeezed and rubbed her breasts, and rubbed her legs. D.F. remembered him reaching under her pants and rubbing her in the vaginal area and that he tried to stick his tongue in her mouth. D.F. told Dr. Pucci that Rizzo would talk to her about sexual dreams and problems he was having with his wife. D.F. told Dr. Pucci that Rizzo

would suggest to her that she had been "sexually abused by her adult males essentially trying to create false memories." Dr. Pucci testified that D.F. felt threatened by Rizzo and people associated with him:

> According to [D.F.], [Rizzo] had threatened to kill her and kill her parents if she told anyone. He told her he was associated and worked for the mafia and that things could happen to her, and no one would ever know; and she took this to mean that her life and her parents' life was in danger.

¶ 11.   As Dr. Pucci's factual testimony concluded, the prosecutor engaged her in the following exchange:

> Q:   Did you ever discuss with [D.F.] in the course[ ] of your treatment why she delayed this report for over a year?
>
> A:   Yes. We talked about why she finally did report it, and she talked about not wanting to report it when I saw her in 1996 because she and her family didn't want to press charges; and that changed throughout the course of time, and by 1997 she did want to report it . . . .
>
> Q:   Dr. Pucci, do you have an opinion as to a reasonable degree of psychological certainty why someone would not report a crime like this under these circumstances?
>
> [DEFENSE COUNSEL]:   Objection, your Honor.
>
> THE COURT:   It's overruled. The witness may answer.
>
> A:   Could you repeat the question?
>
> Q:   Do you have an opinion to a reasonable degree of psychological certainty why someone would, in this position, would not immediately report a crime like this?

A: Often people are reluctant to report this kind of crime because of threats the offender or the abuser makes to them about it, either directly telling them not to tell or threatening them if they do tell. Often people are embarrassed. They may be afraid that they are not going to be believed. Sometimes they have some positive feelings about the abuser and may not want to get that person into trouble. Those tend to be the most common reasons.

¶ 12. In addition, upon redirect examination, Dr. Pucci gave further testimony concerning D.F.'s delay in reporting:

Q: Dr. Pucci, what was your recollection of the reason [D.F.] did not want to report this in 1996?

A: She did not want to press charges against Mr. Rizzo, and she just wanted him to leave them alone and just wanted him to go away and not hurt anyone again.

Q: Did she ever discuss with you anything in regard to concerns about whether or not she would be believed? Was that ever discussed that you recall or not?

A: She told me that he, that Mr. Rizzo, had told her that if she told anyone she would not be believed.

. . . .

Q: 1997. Dr. Pucci, I'm framing that question in terms of your contact with her in 1997. Did she indicate at that time whether that was something she had internalized as a reason she didn't want to report, or was she discussing that with you as one of the many things that was said?

. . . .

A: My impression is that she had internalized it.

¶ 13. In examining Dr. Pucci's testimony, we are mindful of our supreme court's admonition in *Rizzo I*

that we are not to take a mechanistic approach when making a *Jensen* evidence determination. *See Rizzo I*, 250 Wis. 2d 407, ¶ 21. *Rizzo I* teaches us that while there are no magic words that must be used by the expert, the essence of *Jensen* evidence is the comparison that the expert witness makes between the behaviors of the sexual assault victim and the common behaviors of other persons known to be victims of sexual abuse. *See Rizzo I*, 250 Wis. 2d 407, ¶ 21. The prosecutor's questions and the State's expert's answers must in some way lead the finder of fact to understand that it may draw a direct comparison between the alleged victim's postassaultive behaviors and those of other victims.

■

¶ 14.    Clearly, the exchanges between the prosecutor and Dr. Pucci on direct and redirect examination make only the requisite comparison between D.F.'s reporting behaviors and the common reporting behaviors of sexual assault victims. *See id.*, ¶ 23 (noting that the reasons that Dr. Pucci gave on redirect examination in explaining why D.F. did not report the sexual assault are strikingly similar to the reasons she gave on direct examination explaining why sexual assault victims generally delay reporting). The only other testimony that could possibly be construed as *Jensen* evidence is Dr. Pucci's statement that she considered D.F.'s behaviors to be "symptoms." However, Dr. Pucci did not testify explicitly that D.F.'s "symptoms" were consistent with those of sexual assault victims nor did she discuss anywhere in her testimony what "symptoms" known sexual assault victims commonly exhibit. We can find nothing in her testimony that would lead a jury to even infer that Dr. Pucci was equating D.F.'s other postassaultive behaviors or "symptoms" with those commonly

observed in others known to be sexual assault victims. Dr. Pucci simply provided a fact-intensive discussion of D.F.'s own postassaultive reactive behaviors without providing any information that would serve as the basis for comparing D.F.'s behaviors with those of other known sexual assault victims. We therefore conclude that the trial court properly determined that Dr. Pucci's *Jensen* testimony was limited to D.F.'s reporting behaviors.

¶ 15. Rizzo also contends that in *Rizzo I* our supreme court examined Dr. Pucci's testimony and "unequivocally concluded" that her *Jensen* testimony encompassed more than just delayed reporting and that we are bound by this determination. Rizzo submits that in the decision, the supreme court spoke in very broad terminology that generically categorized Dr. Pucci's testimony as *Jensen* evidence. The supreme court's chosen terminology, however, must be read in the context in which it was written.

¶ 16. In reaching its conclusion that the State had introduced *Jensen* evidence, our supreme court expressly relied on the two exchanges between Dr. Pucci and the prosecutor on direct and redirect examination that specifically involved delayed reporting to conclude that Dr. Pucci had made the necessary comparison between D.F. and the common behaviors of sexual assault victims. *Rizzo I*, 250 Wis. 2d 407, ¶¶ 21–23. According to the court, it was the phrasing of the prosecutor's questions and the substance of Dr. Pucci's answers in those two specific exchanges that combined to send a clear message to the jury that a direct comparison was to be drawn between D.F. and others who shared her circumstances. *See id.* We can find nothing in the supreme court's discussion of Dr. Pucci's testimony in *Rizzo I* suggesting that the court inter-

preted Dr. Pucci's testimony as drawing a more general comparison between D.F.'s postassaultive behaviors and their consistency with the common behaviors of sexual assault victims. Accordingly, we decline to accept Rizzo's invitation to read *Rizzo I* as establishing that Dr. Pucci's *Jensen* testimony embraced more than just delayed reporting.

¶ 17.   Having established the scope of the *Jensen* evidence in this matter, we now turn to whether Rizzo is entitled to have his expert, Dr. Ackerman, conduct a psychological evaluation of D.F. In *Maday*, we held that a defendant is entitled to a pretrial psychological examination of a complainant when the State seeks to offer *Jensen* testimony. *Maday*, 179 Wis. 2d at 357. Recognizing the need to balance the defendant's right to present relevant evidence with the privacy interests of the victim, we determined that a defendant is not entitled to a pretrial psychological examination in every case where the State intends to introduce *Jensen* evidence. *Maday*, 179 Wis. 2d at 360; *Rizzo I*, 250 Wis. 2d 407, ¶ 15. Rather, we concluded that the defendant must present the circuit court with "evidence that he or she has a compelling need or reason" for the examination. *Maday*, 179 Wis. 2d at 360. We identified seven factors for circuit courts to consider in determining whether to grant the defendant's request for an examination; however, only the seventh factor—that is, whether, based on the testimony of the defendant's named experts, a personal interview with the victim is essential before the experts can form an opinion, to a reasonable degree of psychological or psychiatric certainty, that the victim's behaviors are consistent with the behaviors of other victims of sexual abuse—is relevant in this ap-

peal.[3] The determination of whether a defendant has presented evidence demonstrating a compelling need for a pretrial psychological examination based on the seven factors is a matter for the trial court's discretionary determination. *Rizzo I*, 250 Wis. 2d 407, ¶ 43.

■

¶ 18. Rizzo submits that in his affidavit and through his testimony at the motion hearing, Dr. Ackerman established that a psychological examination of D.F. is necessary for him to develop opinion testimony that would counter the State's *Jensen* evidence regarding D.F.'s behavior. Rizzo points out that Dr. Ackerman testified that a personal interview with and a psychological examination of D.F. was necessary for him to render an expert opinion as to whether D.F.'s "behaviors

---

[3] The seven factors the *Maday* court identified are:

(1) the nature of the examination requested and the intrusiveness inherent in that examination;

(2) the victim's age;

(3) the resulting physical and/or emotional effects of the examination on the victim;

(4) the probative value of the examination to the issue before the court;

(5) the remoteness in time of the examination to the alleged criminal act;

(6) the evidence already available for the defendant's use; and

(7) whether, based on the testimony of the defendant's named experts, a personal interview with the victim is essential before the expert can form an opinion, to a reasonable degree of psychological or psychiatric certainty, that the victim's behaviors are consistent with the behaviors of other victims of sexual abuse.

*State v. Maday*, 179 Wis. 2d 346, 360, 507 N.W.2d 365 (Ct. App. 1993).

and symptomatology" were consistent with those of other sexual abuse victims and that without such an examination he would not "be able to render a psychologically accurate opinion as to whether or not D.F.'s condition was consistent with that of other sex-abuse victims." Rizzo also cites to Dr. Ackerman's testimony that he would like to administer psychological tests because they would "tell us whether the individual is lying or exaggerating if she has been sexually abused." Finally, Rizzo observes that in his affidavit Dr. Ackerman avowed that he had identified twenty-seven areas of concern that an independent psychological evaluation and record review would help to resolve, including: several incidents of prior unreported sexual abuse by ·D.F., a history of her acting out sexually, inconsistencies with her definition of sexual abuse, the frequency of the alleged abuse by Rizzo, D.F.'s history of lying and blaming others, evidence of delayed recall, evidence of false memories, and presence or absence of a basis for psychological testing.

¶ 19.  While Dr. Ackerman's statements in his affidavit and on direct examination explain why he believes a psychological examination of D.F. is necessary for him to render expert opinion testimony on a variety of topics, including whether or not the allegations were false, these statements do not provide any basis for concluding that a psychological examination is necessary to develop an opinion that responds to Dr. Pucci's *Jensen* testimony about delayed reporting. The purpose of the *Maday* rule is to level the playing field by giving the defendant an opportunity to counter the State's *Jensen* evidence. *See Maday*, 179 Wis. 2d at 357 ("A defendant who is prevented from presenting testimony from an examining expert when the state is able to

present such testimony is deprived of a level playing field .... Fundamental fairness requires that [the defendant] be given the opportunity to present relevant evidence to counter this evidence from the state.") We cannot find any statement, nor does Rizzo point to any statement, by Dr. Ackerman that he required a personal interview with the victim in order to rebut the State's *Jensen* testimony about delayed reporting. In fact, on cross-examination, Dr. Ackerman essentially conceded that he could assess the delayed reporting aspects of the case without conducting a personal interview.[4] Accordingly, we conclude that the trial court properly exercised its discretion when it found that Rizzo had not demonstrated a compelling need for a psychological examination of D.F.[5]

---

[4] The State's cross-examination of Dr. Ackerman concluded with this exchange:

> Q: Let me ask you this again, Dr. Ackerman .... Given the review you have had of this case, which is limited in terms of what you have been apparently given to review, if I were to ask you now do you have an opinion why someone would not immediately report sexual assault, would you, Dr. Ackerman, [with Dr. Pucci's testimony] as your credential be able to offer an opinion on that question?
>
> A: Yes.
>
> Q: And would you be able to offer an opinion on that I think pretty simple question, probably simpler than anything I have asked today, without conducting testing or an examination of the person involved in that specific case?
>
> A: The answer to that specific question would be yes.

[5] On appeal, Rizzo also argues that we should determine that he is entitled to have Dr. Ackerman review D.F.'s treatment records. However, because we conclude that Rizzo has not shown a compelling need for a psychological examination of D.F.

*By the Court.*—Judgment and order affirmed.

pursuant to *Maday*, 179 Wis. 2d at 359–60, and is therefore not entitled to a new trial, we need not address his request for the treatment records.